STATE of Tennessee, Appellee,

v.

Jonathan Wesley STEPHENSON,
Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 9, 1994.

Rehearing Denied June 20, 1994.

Edward C. Miller, Public Defender, Dandridge, William M. Leibrock, Newport, Brock Mehler, Nashville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, and Amy L. Tarkington, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

ANDERSON, Justice.

In this capital case, the defendant, John Wesley Stephenson, was convicted of first-degree premeditated murder and conspiracy to commit first-degree murder. In the sentencing hearing, the jury found one aggravating circumstance; "the defendant ... employed another to commit the murder for remuneration or the promise of remuneration." Tenn.Code Ann. § 39-13-204(i)(4) (1991). The jury found that "there are no mitigating circumstances sufficiently substantial to balance or outweigh" the statutory aggravating circumstance and sentenced the defendant to death by electrocution. The trial court also sentenced the defendant to twenty-five years consecutive to the death penalty on the conspiracy conviction.

On appeal, the defendant raises numerous issues for our review which involve alleged errors occurring during both the guilt and sentencing phases of the trial. We have carefully considered the defendant's contentions as to errors occurring during the guilt phase and have determined that none have merit. We therefore affirm the convictions.

As to the sentencing phase in this case, both the crimes and the trial occurred *after* the effective date of the 1989 amendments to the capital sentencing statute, which allowed imposition of the death penalty only upon a jury finding that the State "has proven beyond a reasonable doubt that the aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn.Code Ann. § 39-13-204(g)(2)(B) (1991). The trial court, however, erroneously instructed the jury at sentencing by using the language of the pre-1989 statute, which did not contain the "beyond a reasonable doubt" standard. Thereafter, the error was compounded when the trial court delivered to the jury a pre-1989 jury verdict form to use in returning the sentencing verdict. This form also did not contain the "beyond a reasonable doubt" standard and differed in other respects from the 1989 statute, as amended. The jury returned its verdict on the old form, which provided that:

> We, the jury, unanimously find that there are no mitigating circumstances sufficiently substantial to balance or outweigh the statutory aggravating circumstance or circumstances listed above. Therefore, we, the jury unanimously find that the punishment shall be death by electrocution for the offense of murder in the first degree.

*See* Tenn.Code Ann. § 39-2-203(g) (1982). All twelve jurors personally signed the finding and verdict.

A criminal defendant is entitled to have the issues at the sentencing phase of a capital trial determined by a jury that has been correctly instructed as to the applicable law. The instructions given the jury in this case were both conflicting and incorrect as to the law. That error was compounded when the jury made its findings and returned its verdict on a pre-1989 jury verdict form. Because the death penalty was imposed on a lower standard of proof than that provided by law, the result is a facially void verdict and prejudicial error. We are unable to conclude that such a fundamental error as to the standard of proof required for a sentence of death was harmless beyond a reasonable doubt. Therefore, the sentence of death is reversed and the case is remanded for resentencing.

Many of the alleged sentencing phase trial court errors asserted by the defendant in this appeal have been rendered moot because of the necessity of a remand and are pretermitted. We will, however, address alleged trial court errors in the sentencing phase which may become relevant on remand.

## BACKGROUND

The State's proof introduced at the guilt phase of trial demonstrated that around 10:00 a.m. on December 4, 1989, the body of Lisa Stephenson, was found in the driver's seat of her car, which was parked on a rural road in the Bruner's Grove Community of Cocke County, Tennessee. Stephenson had died from a massive gunshot wound to her forehead inflicted by a high powered rifle fired at close range. The pathologist described the cause of death as "high velocity rifle destruction of the head and brain." A single gunshot had pierced the car's front windshield, and fragments of glass found in the victim's body were consistent with the fatal bullet's having passed through the windshield. The pathologist testified that the victim had died at least twelve to fifteen hours before the autopsy he performed around 6:30 p.m. on December 4, 1989.

At the time of Lisa Stephenson's death, Jonathan Wesley Stephenson was a truck driver employed by Just in Time Express (J.I.T. Express) in Morristown. She and the defendant had been married eight years. Two sons, ages eight months and four years, had been born to the marriage. The couple lived southwest of Morristown in the Talbott area, in a trailer behind the home of H.A. Saylor, Lisa's father. On December 3, 1989, Saylor saw the defendant leave around 5:30–6:00 p.m. Later that evening, around 8:30, both Saylor and his wife heard someone drive away from the trailer where Lisa and the defendant lived. The next morning Lisa was missing and the two children were found alone in the trailer.

In March of 1989, the defendant met Julie Webb at Rumors, a bar in Knoxville, and the two began an affair. The defendant told Webb that his wife, Lisa, had died five years earlier and that he was living with her sister "Kathy," by whom he had two children. In June of 1989, Lisa telephoned Webb's residence while the defendant was there and asked to speak to him. Webb also confirmed that in October 1989 she and the defendant had taken without permission a boat and motor from the home of the defendant's father just outside St. Louis, Missouri.

The evidence showed that the defendant had asked at least two acquaintances to kill his wife. The first, Glen Franklin Brewer, a driver at J.I.T. Express, testified that on "numerous occasions" the defendant asked him to kill a "friend's wife," who lived in the Talbott area. In return for the killing, the defendant first offered Brewer a boat, motor and a pickup truck, and another time promised to pay Brewer $3,000. Still later, he offered Brewer $5,000 from the proceeds of an insurance policy on the victim.

The defendant was, in fact, the beneficiary of a $5,000 life insurance policy on his wife. Brewer testified that the defendant complained about his wife's psychiatric and medical expenses and said he wanted a divorce but could not afford it because he would lose everything. Michael Litz, an acquaintance, testified that in the fall of 1989 the defendant offered him $5,000 to kill Lisa because she was going to divorce him and take everything.

Dave Robertson, the office manager at J.I.T. Express, testified that he was with the defendant when he met Julie Webb in March 1989, and that he knew of their continuing relationship. In July of 1989, the defendant told Robertson he was going to kill his wife by getting her drunk and shooting her as she slept. Robertson recounted that on one occasion he was at the defendant's trailer when Stephenson indicated that he was going to "do it." The defendant then went into the room where his wife was sleeping but returned a short time later and confessed that he could not.

Around the end of November 1989, Stephenson introduced Robertson to Ralph Thompson and tried to persuade Robertson to give Thompson a job at J.I.T. Express or set him up in a wood pallet company "[a]fter they take care of the business," to which Thompson responded, "Well, I'm not going to

take the heat." Stephenson replied, "If anything happens, I'll take the heat." A few days later, Stephenson told Robertson that he and Thompson "were going to take care of it soon."

On the fatal night, Sunday, December 3, 1989, Michael Litz testified he and Ralph Thompson were watching movies at Thompson's house when the defendant came by and ostensibly took Thompson to an "interview" at Robertson's house. Robertson's version was that, around 8:15 p.m. that night, the defendant and Thompson arrived at his house and asked him to help Thompson get a job at Transco Leasing Corporation. The two men stayed at Robertson's house fifteen to twenty minutes. As they were leaving, the defendant told Robertson, "If anyone asks, I was here from 8:15 until 9:45."

Robertson testified that at approximately 7:30 the next morning, the defendant called him at work and told him, "Well, Ralph and I did it last night." Around midmorning the defendant called again to ask if members of the T.B.I. or sheriff's department had been by. Later that afternoon when Lisa's death was known, J.I.T. Express had the defendant flown home from Ohio, where he had gone on a company trip. Robertson picked him up at the Knoxville airport. During the ride back to Morristown, the defendant again told Robertson that he and Thompson "had done it" on Sunday night with a high powered gun or rifle and that he had thrown the bullets out as he drove through Kentucky. As he and Robertson passed near Strawberry Plains on the return trip, Stephenson also threw out the shirt he was wearing because he had carried the bullets in that shirt and feared it might have gunpowder on it. The defendant reminded Robertson, and later Robertson's wife, who was Julie Webb's sister, to tell the sheriff that he and Thompson had been at Robertson's house from 8:15 until 9:45.

Julie Webb testified that on the Sunday before Lisa's death, she had been with the defendant when he purchased some bullets he said were for Thompson. Proof was introduced that Thompson had a 30/30 caliber Winchester rifle in his possession at the time of the murder. Webb also testified that the defendant had called her around 10:30 p.m.

on December 3 to ask her to meet him at Harrogate, about thirty miles from her home in LaFollette. She met him there at 11:00 p.m. He was in his "18 wheeler." Stephenson told Webb that "Kathy" was dead. He said that "Kathy" had been in trouble because she owed "a lot of money to some people" who were going to kill her. He said that Thompson had learned of "Kathy's" danger and taken him to the place where "it" had happened but that they arrived too late to prevent her death. Defendant claimed that he and Thompson pursued two men who were at the scene of "Kathy's" murder, fought with and possibly killed the men. He warned Webb not to contact the police because the police were involved with the people to whom "Kathy" had owed the money. He told Webb that he did not love "Kathy" but that he was "going to miss the bitch." After borrowing Webb's telephone calling card, the defendant left for Ohio. Webb's phone records showed that the calling card was used to charge a phone call from Ohio to Thompson's number at 9:59 a.m. on December 4. On December 5, Webb learned that the defendant had been married to the victim, Lisa Stephenson. In a letter to Webb dated December 30, 1989, the defendant had asked her not to say anything about the time they had met in Harrogate and urged her not to get involved.

On December 4, 1989, T.B.I. Agent David Davenport interviewed the defendant, who said he had been with Thompson at Robertson's house until 10:00 p.m., when he had gone to J.I.T. Express to leave on a trip at 10:15 p.m. Although the defendant said that he and his wife were "getting along great," he admitted having a girlfriend and suspecting that his wife had a boyfriend. He professed his innocence.

On December 5, the defendant gave a similar statement to Davenport concerning his whereabouts on the evening of December 3; but when confronted with Thompson's admission of his involvement in Lisa's death, the defendant said he had been asked by Robertson to find someone to kill Robertson's former wife, whom Robertson had been divorcing at the time. The defendant said that he had taken Thompson, who was carrying a

rifle, to Robertson's house. Thompson left the defendant at Robertson's house, returned about two hours later and announced "it was done." The defendant implied that it was Robertson's ex-wife, not Lisa, who had been the intended victim.

Finally, when informed that Robertson was no longer supporting his alibi, the defendant admitted to Davenport that he and Thompson had planned to kill Lisa Stephenson. He said that on December 2, 1989, Thompson had taken Lisa to a place where he told her she would pick up some money for a drug run. The next evening, after the defendant and Thompson left Robertson's house, Thompson directed the defendant to drive to a gravel road somewhere in the country. Thompson, armed with a rifle, got out of the vehicle. The defendant then drove up the road a short distance, saw some headlights pass by, and waited until he heard a shot. The defendant then drove back down the road, where he saw Lisa's car, picked up Thompson and drove away. Thompson fired the rifle again and gave two empty shells to the defendant, who threw them away on his trip to Ohio. He admitted telling Julie Webb at Harrogate about "Kathy's" death, telephoning Robertson, and throwing the shirt away near Strawberry Plains. He said that Thompson had asked for his boat, motor, and truck in exchange for killing Lisa. He denied pulling the trigger or arranging the set-up and said that Thompson had taken care of everything.

The defense theory at trial was that either Julie Webb or Dave Robertson was responsible for Lisa's death. Stephenson's parents testified that he had been distraught and drunk when he confessed to involvement in Lisa's death and that during the December 5 interrogation, law enforcement officers refused to let the defendant speak to them or to a lawyer they had employed on his behalf. They also testified that Lisa's father and stepmother had told them they had heard a car leave Lisa's trailer around 10:30 p.m., not 8:30 p.m., as the Saylors had testified at trial.

Defendant presented evidence through two truck drivers that he had left the J.I.T. Express truck lot around 10:00 p.m. on December 3, at the same time the two other drivers had left on separate trips in their own trucks. He had driven up the road with them until he stopped in Bean Station, where, he told them, he needed to make a telephone call.

In rebuttal the State offered Detective Robert Caldwell of the Cocke County Sheriff's Department to testify that at the time of his confession, the defendant was not intoxicated but was coherent and rational.

Based on this evidence, the jury found the defendant guilty of premeditated first-degree murder and conspiracy to commit murder.

In the sentencing phase of the trial, the State presented no new proof but called the jury's attention to the defendant's confession, in which he admitted promising to give Thompson his boat, motor, and truck if Thompson killed his wife. Thompson's wife, Debbie, however, testified that she and her husband had free use of and access to the defendant's boat and truck any time they wanted it.

In mitigation, Stephenson's father and mother testified as follows: Because the father had been an officer in the Air Force, the family had moved a great deal and the father was absent from home frequently, sometimes for considerable periods of time. These factors had caused the defendant's childhood to be unstable. He was also frequently ill as a child, in addition to being dyslexic and a below average student. While his father's absences upset Stephenson, his parents' divorce when he was seventeen proved "totally devastating" to him. At this time the defendant attempted suicide and was hospitalized at the Alaska Psychiatric Institute for several weeks. Stephenson, at one point, enlisted in the military but was discharged after only a few weeks due to a mentally dependent personality.

Based on the proof at the sentencing hearing, the jury found, beyond a reasonable doubt, the existence of one aggravating circumstance, "the defendant ... employed another to commit the murder for remuneration or the promise of remuneration." Tenn. Code Ann. § 39–13–204(i)(4) (1991) [formerly Tenn.Code Ann. § 39–2–203(i)(4) (1982) ]. In addition, the jury found, in accordance with the verdict form delivered to them by the

court, that there were "no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance" and, as a result, sentenced the defendant to death.

## PART I.

### GUILT PHASE—TRIAL ERRORS

#### A. Alleged Double Jeopardy Violation

■ The defendant initially asserts that his rights under the double jeopardy clause of the Fifth Amendment to the United States Constitution were violated because he was convicted of both first-degree murder and conspiracy to commit first-degree murder. The double jeopardy prohibition embodied in the Fifth Amendment is applicable to the states through the Fourteenth Amendment[1] and protects criminal defendants from being "subject for the same offense to be twice put in jeopardy of life or limb."

In *State v. Black*, 524 S.W.2d 913 (Tenn. 1975), this Court adopted the well-known "*Blockburger* test"[2] for determining when to sustain multiple convictions which are based upon the same acts or transaction. The broad question is whether or not the offenses at issue constitute the "same offense" under the double jeopardy clause. As *Black* makes clear, multiple convictions do not violate double jeopardy if "[t]he statutory elements of the two offenses are different, and neither offense is included in the other." *Id.* at 920, citing *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Specifically, the *Blockburger* test requires that "courts examine the offenses to ascertain "whether each [statutory] provision requires proof of a fact which the other does not." *Id.*, 420 U.S. at 786, 95 S.Ct. at 1294, quoting *Blockburger v. United States*, 284 U.S. at 304, 52 S.Ct. at 182.

This Court has previously stated that a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. *See State v. Smith*, 197 Tenn. 350, 273 S.W.2d 143, 146 (1954); *Solo-*

*mon v. State*, 168 Tenn. 180, 187–88, 76 S.W.2d 331, 334 (1934). In determining whether there has been a double jeopardy violation in this case, we must compare the statutory elements of criminal conspiracy and the statutory elements of first-degree murder, in accordance with the *Blockburger* test.

Stephenson was convicted of premeditated first-degree murder, which is defined by statute as "an intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (Tenn.1991). A criminal conspiracy is committed "if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." Tenn.Code Ann. § 39–12–103(a) (1991). A comparison of the two statutes clearly demonstrates that the two offenses are not identical and do not rest on the same facts. First-degree "[m]urder requires proof of a killing, but not necessarily of an agreement with another person or persons to commit that killing. Conspiracy on the other hand, requires proof of an agreement but proof of the killing is not necessary." *Chinn v. State*, 511 N.E.2d 1000, 1003 (Ind.1987). We, therefore, conclude it was constitutionally permissible for Stephenson to be convicted of both first degree murder and conspiracy to commit first-degree murder. *Cf. State v. Brittman*, 639 S.W.2d 652, 653–54 (Tenn.1982).

#### B. Severance

■ Next, Stephenson contends that the trial court erred in granting a severance of co-defendant Thompson's trial. The record on appeal contains only a brief discussion of the State's motion to sever defendant's and co-defendant Thompson's trials. Apparently, a hearing was conducted on the State's motion to sever in Jefferson County prior to the beginning of Stephenson's trial in Cocke

---

**1.** *See Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964).

**2.** This test was enunciated by the United States Supreme Court in *Blockburger v. United States*,

284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The test was recently reaffirmed by the U.S. Supreme Court in *United States v. Dixon*, —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

County; and over the defendant's objection, the trial court granted the State's motion to sever. The transcript of that hearing is not in this record. From the statements contained in this record, however, it appears that the State sought the severance because both defendants had made incriminatory statements but each had said that the other had pulled the trigger.

Under Tennessee Rule of Criminal Procedure 14(c)(2)(i), a court on motion of the State shall grant a severance of defendants if "it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." In *State v. Barber,* 753 S.W.2d 659, 671 (Tenn.1988), this Court noted that a motion to sever is addressed to the sound discretion of the trial court and that its exercise of such discretion will not be reversed unless there is prejudice to the defendant. Thereafter, we held that severance was appropriate where the State would have been unable to introduce a statement by the co-defendant at a joint trial because it could not be redacted, without substantially altering its meaning, to meet the requirements of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). This is apparently the ground upon which the trial court justified severance in the present case. We conclude that, under the present record, the defendant has failed to show that he was prejudiced by the trial court's granting the severance.

We also reject the defendant's argument that the severance allowed the State to rely upon inconsistent theories at both trials and thereby violated his constitutional right to due process. In support of this argument the defendant relies upon *Nichols v. Collins,* 802 F.Supp. 66, 72–75 (S.D.Tex.1992); however, *Nichols* is factually distinguishable and inapposite here. This issue is without merit.

### C. Bill of Particulars

■ The defendant also assigns as error the trial court's denial of his motion for a bill of particulars that would have required the State to inform him of whether he would be tried as a principal or accessory. Specifically, the defendant was attempting to determine whether the State considered him the triggerman. The trial court denied the motion on the grounds that there is no rule requiring the State to credit one co-defendant's statement and discredit the other.

■ Tennessee Rule of Criminal Procedure 7(c) provides that, "upon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." The test in passing on a motion for a bill of particulars is whether it is necessary that the defendant have the information sought in order to prepare his defense and to avoid prejudicial surprise. A defendant should be given enough information about the events charged so that he may, with diligence, adequately prepare for trial. If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. A bill of particulars is not intended to be a means of learning the State's evidence and theories, although, to the extent the information sought is necessary, it will be required, even if to do so discloses the State's evidence or theories. *State v. Hicks,* 666 S.W.2d 54, 56 (Tenn. 1984), *quoting* 1 C. Wright, *Federal Practice and Procedure, Criminal,* § 129, p. 434 (1982).

At the hearing on the motion, Stephenson argued that he needed to know whether he was going to be accused as the triggerman in order to know whether to bring in evidence that Thompson was "the big rifle man" and that he himself had "never shot a gun in his life." There is no allegation, however, that the defendant had not been fully apprised of and given access to all discoverable information concerning the case from the State. As the State points out, the defendant was trying to compel the State to commit itself to a particular theory of the case. Under these circumstances, the trial court did not abuse its discretion in denying a bill of particulars. Moreover, there is no showing that the defendant was prejudiced in the preparation of his defense by the lack of the specific information requested. This issue is without merit.

### D. "Alias" on the Indictment

■ Stephenson's next contention is that the trial court erred in denying his motion to strike the word "alias" which appeared after the defendant's name on the indictments in this case. The trial court denied the motion to strike after concluding that the use of the term in the indictment was not prejudicial; however, it ordered that no one mention the term in the presence of the jury.

■ While the term "alias" should not be included in an indictment where there is no proof that the defendant on trial uses an alias, such error does not warrant reversal when there is no showing of prejudice to the defendant. *See State v. Laney,* 654 S.W.2d 383, 386 (Tenn.1983); *Mallicoat v. State,* 539 S.W.2d 54, 56 (Tenn.Crim.App.1976). Stephenson has failed to demonstrate prejudice warranting reversal. This issue is without merit.

### E. Alleged Errors Occurring During Voir Dire

■ The defendant complains first because he was not granted individual sequestered voir dire to inquire about the prospective jurors' attitudes toward the death penalty and to question prospective jurors about their exposure to pretrial publicity. In the matter of death-qualification, the defendant was granted individual, but not sequestered, voir dire.

■ The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court. *State v. Howell,* 868 S.W.2d 238, 247 (Tenn. 1993); *State v. Harris,* 839 S.W.2d 54, 65 (Tenn.1992). This Court has previously rejected the proposition that death qualification of a capital jury must be conducted by individual, sequestered voir dire. *State v. Smith,* 857 S.W.2d 1, 19 (Tenn.1993); *see also State v. Porterfield,* 746 S.W.2d 441, 447 (Tenn. 1988). We continue to adhere to that position. Defendant has failed to show that group voir dire of the prospective jurors' about their attitudes toward the death penalty and their ability to follow the sentencing law prejudiced him in anyway. *See Smith,* 857 S.W.2d at 19; *Harris,* 839 S.W.2d at 65.

■ As to the defendant's complaint about pretrial publicity, individual sequestered voir dire is mandated when there is a "significant possibility" that a juror has been exposed to potentially prejudicial material. *Harris,* 839 S.W.2d at 65; *State v. Claybrook,* 736 S.W.2d 95 (Tenn.1987). The record does not show a "significant possibility" of such exposure in this case. Moreover, the trial court granted individual voir dire on publicity; but the defendant did not conduct it because it apparently was unnecessary.

Nevertheless, the defendant charges error as a matter of law in the court's failure to inquire into the extent of the prospective jurors' exposure to pretrial publicity. The defendant concedes that the procedure used by the trial court complies with the federal constitution, *see Mu'Min v. Virginia,* 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), but argues that the Tennessee Constitution supplies greater protection. In support of that argument, he cites a recent Michigan case, *People v. Tyburski,* 196 Mich. App. 576, 494 N.W.2d 20, 24–27 (1992), which held that the trial court abused its discretion under established Michigan common law when it did nothing more than ask if prospective jurors had been exposed to media accounts and whether they had formed any opinions regarding the matter. In *Tyburski,* the court alone conducted all voir dire. In Tennessee, all counsel participate in voir dire. The trial court here committed no error in the conduct of voir dire.

■ The defendant next argues that the trial court erred in denying his pretrial motion to disseminate a detailed questionnaire to the prospective jurors. The trial court did not abuse its discretion in this matter. *See Smith,* 857 S.W.2d at 20.

■ Finally, the defendant argues that the trial court erred when it "injected" religious law into the voir dire proceedings by engaging in a brief discourse on the meaning of the biblical passage, "Judge not so you be not judged." The State suggests that these remarks were in response to defense counsel's earlier inquiry as to whether

"anyone [had] any religious convictions or teachings that would have an effect ... if you deliberate on the death penalty." The court's comments were isolated remarks in the course of voir dire made two days before the verdict of conviction and three days before sentence was imposed. Reference to religious law during a criminal trial has been disapproved in this State, and trial court judges should therefore refrain from any discussion of religious law. Absent some showing by the defendant, however, that he was prejudiced, such comments do not require reversal. *See Kirkendoll v. State,* 198 Tenn. 497, 281 S.W.2d 243, 254 (1955) (prosecutor's references to religious principles).

### F. Daily Transcripts

Stephenson next makes a novel claim that the trial court erred in refusing to provide him access to daily transcripts of the trial proceedings, which he asserts were necessary to provide effective assistance of counsel under both the state and federal constitutions.

No statute or case authority mandates that daily transcripts be provided a defendant. On appeal, the defendant has the burden to show that the transcript was needed to vindicate a legal right. *See State v. West,* 767 S.W.2d 387, 402 (Tenn.1989); *State v. Elliott,* 524 S.W.2d 473, 475–77 (Tenn.1975). In the present case, Stephenson has made no attempt to articulate how he might have used these transcripts to his advantage or how the lack thereof impaired his defense. This issue is without merit.

### G. Alleged Evidentiary Errors

Stephenson assigns as error several rulings of the trial court admitting evidence. First, the defendant contends that the victim's father should not have been allowed to testify that he found a $5,000 life insurance policy on his daughter's life when he looked through her personal effects after her death. The policy was issued in June of 1988 and the beneficiary was the defendant. Stephenson claims the evidence was irrelevant and therefore inadmissible under Tennessee Rules of Evidence 402 and 403. This argument is without merit.

As the State points out, the policy was relevant to establish motive, and the defendant's offer of $5,000 to Glenn Brewer and Michael Litz as payment for killing the victim is proof that the defendant knew about the policy. Furthermore, evidence of the policy was also relevant to the defendant's claim that he had been set up by Dave Robertson, who allegedly had asked the defendant to find someone to kill his [Robertson's] wife. The defendant's offer to pay an amount for killing the victim equal to the amount of insurance on the victim's life tends to refute this theory and identify the intended victim as Lisa Stephenson.

Equally without merit is Stephenson's assertion that the testimony of his co-worker, Glenn Brewer, about the defendant's attempts to hire Brewer to kill "a friend's wife" was inadmissible evidence of prior bad acts. Tennessee Rule of Evidence 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

In compliance with the rule, the trial court conducted a pre-trial hearing and ruled that evidence of the defendant's previous attempts to hire various individuals to kill his wife would be admissible on the issue of intent. Brewer testified that, as early as June 1989, defendant had asked him to kill "a friend's wife." Descriptions of the proposed victim's residence and living circumstances given to Brewer by the defendant matched those of Lisa Stephenson. This testimony is

clearly within the trial court's holding that prior attempts by the defendant to hire persons to kill his wife would be admissible as relevant to intent. There is no merit to this issue. *See* Tenn.Code Ann. § 39–13–202(a)(1) ("First degree murder is ... [a]n *intentional,* premeditated and deliberate killing of another....") (emphasis added).

■ Finally, Stephenson contends that the trial court erred in allowing into evidence a photograph of the victim's body in the driver's seat of her automobile. The defendant contends that the photograph was irrelevant and that its probative value was outweighed by its prejudicial effect.

■ Initially, we note that a trial court's decision regarding the admissibility of photographs will not be reversed on appeal absent a clear showing of an abuse of discretion. *Harris,* 839 S.W.2d at 73. Here, Stephenson has failed to show an abuse of discretion. This photograph, which is in no way inflammatory or prejudicial, was used to illustrate the testimony of Detective Robert Caldwell concerning the location of the body and the bullet hole. It was properly admitted pursuant to Tennessee Rule of Evidence 403 and *State v. Banks,* 564 S.W.2d 947, 949 (Tenn. 1978).

### H. Suppression of Confession

■ The defendant argues that the trial court erred in failing to suppress his confession because the confession was taken in violation of both Article I, § 9 of the Tennessee Constitution and the Fifth Amendment of the United States Constitution. Specifically, the defendant argues that the confession should have been suppressed because (1) his intoxication and emotional condition prevented a knowing, intelligent and voluntary waiver of his right to remain silent; (2) the officers influenced his decision by coercion; (3) his rights were violated by the failure of law enforcement officers to inform him that an attorney, employed by his father, was present at the sheriff's department and asking to see him; and (4) he invoked his right to counsel.

The evidence at the suppression hearing reveals that on December 5, 1989, the defendant voluntarily underwent a polygraph exam administered by T.B.I. Agent Ray Presnell at the Hamblen County Sheriff's office from 3:00–5:00 p.m. Before the polygraph was administered, the defendant signed a release. He was also informed of his *Miranda* rights, stated he understood them and signed a waiver to that effect. As part of a pre-test interview, Stephenson told Presnell that he had not been drinking, and Presnell saw no indication otherwise. When the examination was finished, Stephenson left to make funeral arrangements for his wife.

Later that evening, Stephenson returned to the Hamblen County Sheriff's Office, where Presnell saw him at 9:00 p.m. and confronted him with problems on his polygraph test. Presnell described the defendant as very nervous and upset, but rational. Presnell said that the defendant cried at least twice but that he observed nothing to indicate that Stephenson was drunk or heavily under the influence of alcohol. The defendant did ask Presnell if he could see his father, and Presnell replied that he would check with the case agent, David Davenport. Stephenson did not see his father until after he had given a confession.

The defendant was then interrogated by Agent Davenport in the presence of Sheriff Charles Long and Detective Robert Caldwell. At 10:50 p.m., before Davenport began talking with the defendant, Detective Caldwell advised him of his *Miranda* rights. Stephenson read his rights, acknowledged that he understood them, and signed the rights waiver. None of the officers noticed anything to suggest that the defendant was drunk. Davenport said Stephenson initially denied involvement in his wife's death. Davenport then informed him that Ralph Thompson had admitted "what they had done." When the defendant demanded to read Thompson's statement, Davenport brought Thompson to the interview room and went over parts of the statement with Thompson in the defendant's presence. The defendant then gave a statement, different from those he had made earlier, in which he claimed that he had remained at Robertson's house while Thompson left. Defendant continued to in-

sist he had no involvement in his wife's killing.

When Davenport informed Stephenson that Robertson no longer supported his alibi, the defendant asked to see Robertson, whom Davenport brought to the interview room. After this confrontation, Stephenson confessed. Davenport testified that although the defendant cried "off and on" throughout the interview, he remained sober, responsive, logical, and cooperative. Davenport's testimony was supported by that of Sheriff Long and Detective Caldwell. Although Presnell, the polygraph examiner, testified that the defendant asked him if he could see his father, the officers present at the 10:50 p.m. interrogation testified that the defendant never asked to see his parents, who were present at the jail. Davenport began reducing the oral statement to writing at 11:55 p.m. As the agent finished writing down the statement, Stephenson asked if Davenport thought he needed an attorney. Davenport informed him that Ben Strand, a local attorney, was outside with Stephenson's father and added that the defendant was welcome to talk with them. He did not re-advise Stephenson of his *Miranda* rights at that time. The defendant hung his head and said, "No, I'll just go ahead. I'm going to tell the truth." After Davenport finished writing the statement, T.B.I. Agent Bob Denny came in and read the statement to the defendant, who acknowledged that it was his own, made necessary corrections, swore that the statement was true and signed it at 12:25 p.m., at which time the statement was also witnessed by the officers present.

Defendant was next taken to see Strand and his father. He first signed a consent form, drafted by Strand, giving his parents custody of his two children, a matter the defendant had brought up earlier that day with his father. The defendant was transferred to the Cocke County Jail. The jailer testified that he saw nothing leading him to believe that the defendant was drunk.

As the trial court recognized, there was "a direct dispute" between the testimony of the State's witnesses and those of the defendant. According to the defendant, he had begun drinking even before the polygraph test. After he left the polygraph test, he said, he bought a bottle of 101 proof whiskey, which he immediately began consuming straight from the bottle. Both of the defendant's parents testified that, when they saw the defendant at his in-laws' home around 6:00 to 7:00 p.m. that evening, he was drinking heavily, was crying, and was irrational. He allegedly consumed almost the full bottle of whiskey, had trouble walking and talking, and smelled of alcohol. Defendant's father testified that, after he brought his son to the sheriff's department, he advised the officers that his son was drunk and emotional but that his comments were dismissed by the officers, who, despite his requests to see him, proceeded to hold the defendant "incommunicado" until after his confession. Agent Davenport, Sheriff Long and Detective Caldwell testified that neither of the defendant's parents advised them that the defendant was too drunk to be interviewed.

At 10:30 p.m. the defendant's father called Ben Strand, a family friend and attorney, and asked him to come to the sheriff's department to help his son. Strand arrived around 11:20 p.m. and told Agent Davenport he wanted to talk with the defendant. Davenport said that they were finishing questioning the defendant and that it would be "a few minutes." Strand finally saw the defendant at 12:35 a.m., when the defendant executed a document giving custody of his children to his parents. Strand described the defendant as upset and looking like a person who had not slept.

The defendant claimed that during the interrogation he had asked "countless" times to see his father, and stated that he did not recall being advised of his rights at the polygraph test or at 10:50 p.m. He denied that the statement was his and said that Davenport had made it up and, in a threatening manner, had repeatedly told him to sign it or he would not see his family. The officers present at the interrogation denied these allegations.

The trial court accredited the testimony of the officers on the issues of intoxication and coercion and specifically found that the defendant was not being truthful. The court held that the defendant was not intoxicated,

had not exercised his right to counsel, and had also made the waivers and given the statements voluntarily and knowingly. Relying on *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the trial court found the fact that defendant's father had tried to hire a lawyer constitutionally irrelevant to the validity of the waiver.

It is well settled that a trial court's determination at a suppression hearing is presumptively correct on appeal. *State v. Harbison*, 704 S.W.2d 314, 318 (Tenn.1986). The trial court resolved the conflicting testimony relevant to the defendant's arguments that the confession was involuntary because of psychological pressures and intoxication in the State's favor. Once so determined, the presumption of correctness may only be overcome on appeal if the evidence in the record preponderates against the trial court's findings. *Id., see also State v. Kelly*, 603 S.W.2d 726, 729 (Tenn.1980); *State v. Johnson*, 717 S.W.2d 298, 304–305 (Tenn.Crim.App.1986). The evidence in this record does not preponderate against the trial court's findings.

### I. Waiver

Next, the defendant charges that the waiver of his rights was invalid *per se* because the law enforcement officers failed to inform him that Attorney Strand was present at the sheriff's department and attempting to see him.

The Fifth Amendment to the United States Constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Although these provisions are not identical, the most significant difference between the provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment. *See State v. Crump*, 834 S.W.2d 265, 268 (Tenn.1992); *State v. Smith*, 834 S.W.2d 915 (Tenn.1992).

Prior to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the admissibility of an accused's in-custody statements depended on whether they were "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Harris v. State*, 217 Tenn. 582, 399 S.W.2d 749 (1966) (holding that the test of admissibility of an incriminating statement under Article I, Section 9 of the Tennessee Constitution is whether it was freely and voluntarily made). In *Miranda*, however, the U.S. Supreme Court limited the admissibility of statements that would ordinarily meet the due process test of voluntariness in order to combat the inherently coercive pressures of in-custody interrogation and to permit a full opportunity to exercise the privilege against self-incrimination.

The *Miranda* court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. At a minimum, the Court held, the procedural safeguards must include warnings prior to any custodial questioning that the accused has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have an attorney present during questioning, whether retained or appointed. *Id.*

Echoing the standard first enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the court stated that the rights could be waived by an accused "provided the waiver was made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628. The relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made with full awareness of both the nature of the right being abandoned and the conse-

quences of the decision to abandon it. The "totality of the circumstances surrounding the interrogation" must reveal both an uncoerced choice and the required level of comprehension before a court can properly conclude that *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); *Kelly*, 603 S.W.2d at 728–29. Later, in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court held that when a person requests an attorney during a custodial interrogation, all questioning must stop until an attorney is present, unless the defendant subsequently initiates conversation with the authorities.

In determining that the defendant's confession was properly admissible pursuant to the standards set forth above, the trial court judge relied on *Moran v. Burbine, supra,* which held, as a matter of federal constitutional law, that a waiver of *Miranda* rights is not rendered invalid by the failure of police to inform an in-custody suspect that an attorney summoned to the police station by a third party is present and attempting to reach the suspect.

In *Moran, supra,* the Court was faced with the issue of whether a suspect's waiver of *Miranda* rights, particularly the right to counsel, was knowingly made. The suspect was in police custody for a burglary when the police received information connecting him with a murder. The police proceeded to interrogate the suspect about the murder, even though they were aware that a public defender, retained by Burbine's sister in connection with the burglary charge, had telephoned the police station and explained that Burbine was represented by counsel, who was not presently available, but that she would act as Burbine's legal counsel if he was questioned or placed in a lineup. Although the police assured the attorney that they had no plans to question Burbine that evening, shortly after the phone call, they began interrogating him about the murder. Before each session, Burbine was informed of his *Miranda* rights and signed waiver forms; however, he was never informed that his sister

had retained a public defender to assist him or that the public defender was trying to reach him. *Id.* 475 U.S. at 415–18, 106 S.Ct. at 1138–39.

Justice O'Connor, writing for the majority, concluded that the actions of the police did not violate Burbine's Fifth, Sixth, or Fourteenth Amendment rights. After noting that the voluntariness of the waiver was not at issue and that there was no dispute about Burbine's understanding of the *Miranda* warnings or the consequences of waiving them, the Court held that the failure of the police to inform Burbine that an attorney was available to assist him was irrelevant to the question of whether he had knowingly waived his rights. *Id.* at 421–22, 106 S.Ct. at 1140–41. The Court stated that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422, 106 S.Ct. at 1141. The Court held that a waiver is valid as a matter of law once it is determined that a suspect was aware of his rights and the State's intention to use his statements against him and that the decision not to invoke those rights was uncoerced. *Id.* at 422–23, 106 S.Ct. at 1141–42. The majority concluded, however, by explicitly stating, "[n]othing we say today disables the States from adopting different requirements for the conduct of their employees and officials as a matter of State law." *Id.* at 428, 106 S.Ct. at 1144.

State courts have adopted differing views on whether an otherwise valid waiver of *Miranda* rights is vitiated by the failure of police, before or during an interrogation, to inform a suspect that appointed or retained counsel is available and seeking to render assistance.

The State of New York, in *People v. Arthur,* 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (1968), adopted the most restrictive view. Under that holding, once the police know of or have been apprised of the fact that a suspect is represented by counsel, or that an attorney has communicated with the police for the purpose of representing the suspect, the police may not question the suspect in the absence of counsel, unless the

suspect waives the right to counsel in the presence of the attorney.

A less restrictive approach has been adopted by a number of other state courts which hold that a suspect in custody who has no knowledge that an attorney is waiting to offer assistance cannot knowingly, intelligently, and voluntarily waive the right to counsel. *See People v. Houston,* 42 Cal.3d 595, 230 Cal.Rptr. 141, 724 P.2d 1166 (1986) (overruled by constitutional amendment); *State v. Stoddard,* 206 Conn. 157, 537 A.2d 446 (1988); *Bryan v. State,* 571 A.2d 170 (Del.1990) (expressly reaffirming *Weber v. State,* 457 A.2d 674 (Del.1983)); *Haliburton v. State,* 476 So.2d 192 (Fla.1985) (affirmed 514 So.2d 1088 (Fla.1987)); *People v. Griggs,* 152 Ill.2d 1, 178 Ill.Dec. 1, 604 N.E.2d 257 (1992) (expressly reaffirming *People v. Smith,* 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325 (1982)); *State v. Matthews,* 408 So.2d 1274 (La.1982); *Commonwealth v. Sherman,* 389 Mass. 287, 450 N.E.2d 566 (1983); *People v. Wright,* 441 Mich. 140, 490 N.W.2d 351 (1992); *State v. Reed,* 133 N.J. 237, 627 A.2d 630 (1993); *State v. Luck,* 15 O.B.R. 296, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1985); *State v. Isom,* 306 Or. 587, 761 P.2d 524 (1988) (implicitly reaffirming *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979)); *Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322 (1977); *State v. Hickman,* 175 W.Va. 709, 338 S.E.2d 188 (1985); *People v. Harris,* 703 P.2d 667 (Colo.App.1985); *Lewis v. State,* 695 P.2d 528 (Okl.Crim.App.1984).

Courts adopting this approach have, in large part, based their rationale on *State v. Haynes, supra,* in which the Oregon Supreme Court stated

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family, that fact may inspire additional confidence. He, too, will perhaps be sent away.... But ... when law enforcement officers have failed to admit counsel to a person in custody or to inform the person of the attorney's efforts to reach him, they cannot thereafter rely on defendant's 'waiver' for the use of his subsequent uncounseled statements or resulting evidence against him.

602 P.2d at 278–79.

The third approach adopted by state courts is in accord with *Moran.* These courts have held that an otherwise knowing, intelligent, and voluntary waiver of *Miranda* rights is not invalidated by the failure of police to inform an in-custody suspect of the fact that an attorney is present and attempting to reach the suspect. *See Ex Parte Neelley,* 494 So.2d 697 (Ala.1986); *McClaskey v. State,* 540 N.E.2d 41 (Ind.1989); *State v. Blanford,* 306 N.W.2d 93 (Iowa 1981); *Lodowski v. State,* 307 Md. 233, 513 A.2d 299 (1986); *State v. Reese,* 319 N.C. 110, 353 S.E.2d 352 (1987); *State v. Burbine,* 451 A.2d 22 (R.I.1982); *State v. Drayton,* 293 S.C. 417, 361 S.E.2d 329 (1987); *State v. Earls,* 116 Wash.2d 364, 805 P.2d 211 (1991); *State v. Hanson,* 136 Wis.2d 195, 401 N.W.2d 771 (1987); *Wheeler v. State,* 705 P.2d 861 (Wyo. 1985).

The rationale upon which these decisions are based, in addition to the *Moran* decision, was best summarized by the Wisconsin Supreme Court as follows:

> We do not believe that the suspect's knowledge of the location of a particular counsel can affect the intelligent waiver of his constitutional rights as described in *Miranda* warnings. Since the knowledge of the location of counsel adds no constitutional rights, does not alter the facts of the case as the suspect knows them, and does not give rise to any coercive influence by the police, such knowledge is not relevant to the suspect's voluntary decision to waive his rights. Although a suspect who was ready to waive his rights might change his mind when told an attorney was waiting to see him, the critical factor would be the convenience of seeing the attorney, not the intelligent perceived need for legal counsel. Since the convenience of the defendant is not constitutionally protected, the location

of a particular attorney is not constitutionally required information.

*State v. Hanson,* 401 N.W.2d at 778.

We must now determine whether the right against self incrimination of Article I, § 9 of the Tennessee Constitution requires that law enforcement officials inform a suspect that an attorney, contacted by his family, is present and attempting to see him before the suspect can make a voluntary and knowing waiver of his state constitutional right to counsel.

■ This Court has had occasion, in the context of considering the validity of guilty pleas, to discuss the principle that constitutional rights may only be relinquished if the waiver is knowing and voluntary. *See, e.g., Johnson v. State,* 834 S.W.2d 922 (Tenn. 1992). The waiver is valid only if it can be characterized as "an intentional relinquishment or abandonment of a known right or privilege." *State v. Mackey,* 553 S.W.2d 337, 340 (Tenn.1977). Accordingly, for Tennessee constitutional purposes, a waiver is valid if the suspect is aware of the nature of the right being abandoned and the consequences of the decision to abandon the right. *See Johnson,* 834 S.W.2d at 924; *Fare,* 442 U.S. at 725, 99 S.Ct. at 2572; *Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1758.

The procedural safeguards mandated by *Miranda* are designed to secure the privilege against self incrimination. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. In that respect, *Miranda* warnings are analogous to the procedural requirements for the acceptance of guilty pleas set forth by this court in *Mackey, supra,* which are designed to ensure that guilty pleas are knowing and voluntary waivers of all the constitutional rights being relinquished. *Johnson,* 834 S.W.2d at 924. In that context, we have stated that "[t]he common and compelling purpose behind all of these rules is to seek to insulate guilty pleas from coercion and *relevant defendant ignorance.*" *Id.,* quoting *State v. Neal,* 810 S.W.2d 131, 135 (Tenn.1991) (emphasis added).

■ Where, as here, a suspect has been fully informed of his rights in accordance with *Miranda* prior to executing a waiver, but does not invoke any of those rights, including the right to counsel, then the failure of law enforcement officials to inform the suspect that an attorney is present and attempting to see him does not invalidate the waiver. By virtue of the *Miranda* warnings, the waiver has been insulated from "relevant defendant ignorance." Although it is beyond dispute that a suspect's request for counsel must be honored, *see Edwards v. Arizona, supra,* a lawyer's request for a client need not be. *Blanford,* 306 N.W.2d at 96.

■ Moreover, we are in agreement with the reasoning of the Wisconsin Supreme Court that a "suspect's knowledge of the location of a particular counsel" does not affect the suspect's ability to understand constitutional rights and cannot, therefore, affect a suspect's ability to knowingly waive those rights. *Hanson,* 401 N.W.2d at 778. Based on the foregoing, we conclude that neither the state nor the federal constitution prohibited admission of Stephenson's confession.

### J. Sixth Amendment Right to Counsel

■ The defendant's final contention is that when he asked Agent Davenport whether the Agent thought he needed an attorney, the question amounted to "at least" an equivocal invocation of his *Sixth* Amendment right to counsel. Because the invocation was not honored, the defendant argues, the confession should be suppressed. The contention, however, is incorrect because neither the Sixth Amendment right to counsel nor the corresponding right embodied in Article I, § 9 of the Tennessee Constitution was applicable. No adversary judicial proceedings had been initiated against the defendant at the time of the alleged "invocation" of his right to counsel. *See Moran v. Burbine, supra,* 475 U.S. at 430–31, 106 S.Ct. at 1146; *State v. Mitchell,* 593 S.W.2d 280, 286 (Tenn. 1980). The defendant's better argument is that he invoked the right to counsel that is encompassed in the right against self incrimination which is protected by the Fifth Amendment of the United States Constitution and Article I, § 9 of the Tennessee Constitution. As noted above, when a suspect invokes the right to counsel, further questioning by the police in the absence of an

attorney is constitutionally impermissible. *See Edwards v. Arizona, supra.*

Although *Edwards* clearly established that all questioning must cease when a suspect invokes the right to counsel, neither this Court nor the U.S. Supreme Court has resolved the issue of what should be regarded as a valid invocation of the right. The *Miranda* Court stated that if the suspect "indicates in any manner and at any stage of the process that he [or she] wishes to consult with an attorney before speaking there can be no questioning." 384 U.S. 444–45, 86 S.Ct. 1612. Moreover, the Supreme Court has made it clear in more recent cases that courts should "give a broad, rather than a narrow interpretation to a defendant's request for counsel." *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986). Most courts, attempting to accommodate both the mandate of *Miranda* and the legitimate goals of law enforcement, have concluded that when a suspect makes an ambiguous or equivocal request for counsel, further questions by officers thereafter must be limited to clarifying the suspect's desire for an attorney. *State v. Kyger,* 787 S.W.2d 13, 22 (Tenn.Crim.App. 1989); *see also Towne v. Dugger,* 899 F.2d 1104, 1107–10 (11th Cir.1990); *United States v. Gotay,* 844 F.2d 971, 975 (2nd Cir.1988); *United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985); *State v. Staatz,* 159 Ariz. 411, 768 P.2d 143, 146 (1988); *People v. Benjamin,* 732 P.2d 1167, 1171 (Colo.1987); *Crawford v. State,* 580 A.2d 571, 576–77 (Del.1990); *Hall v. State,* 255 Ga. 267, 336 S.E.2d 812, 815 (1985); *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988); *but see Maglio v. Jago,* 580 F.2d 202, 205 (6th Cir.1978) (ambiguous invocation requires cessation of all questioning).

Our research reveals that other jurisdictions are fairly evenly split as to whether a suspect's question to an officer about the officer's opinion of the suspect's need for counsel even constitutes an equivocal invocation of the right to counsel. *See, e.g., State v. Prince,* 160 Ariz. 268, 772 P.2d 1121, 1125 (1989); *Byrd v. State,* 261 Ga. 202, 403 S.E.2d 38, 41 (1991) (both holding that the question does not amount to an equivocal

invocation of the right to counsel); *but see Towne v. Dugger, supra; see also generally* Annotation, *What Constitutes Assertion of Right to Counsel Following Miranda Warnings,* 83 A.L.R.4th 443, State Cases § 19, 518–28 (1991). The diversity of opinion most likely results from the reality that the inquiry is uniquely fact specific and is not susceptible of a bright line rule or definition. What constitutes an equivocal invocation of the right to counsel must be determined on a case by case basis.

Because we agree that courts should give a broad interpretation to a suspect's request for counsel, we conclude that the defendant's question herein constituted an equivocal invocation of the right to counsel that limited further interrogation to questions clarifying his desire for an attorney. Agent Davenport clarified the defendant's ambiguous statement by informing Stephenson that an attorney was immediately available if he wished to consult with him. In response, the defendant, who twice previously had been advised of his rights, unambiguously asserted his desire to proceed without an attorney, stating "No, I'll just go ahead. I'm going to tell the truth." This response clearly indicated the defendant's desire to proceed without an attorney. As a result, there was no violation of either the defendant's federal or state constitutional right to counsel. The trial court properly denied the motion to suppress.

### K. Thompson's Statements

██ During opening statement the prosecutor made the following statement:

Proof will show as this investigation developed, this defendant hung on tight to his alibi. "Ralph Thompson and I were at David Robertson's. We were at David Robertson's house from 8:00 to 10:00 that evening. I was up in Harrogate by 10:30. It couldn't have been me." But then, on—proof will show that things began to break down. It all didn't hold together. The glue became "unsticky," I guess you'd call it, because things began to fall apart. During the evening of December 5th, while being questioned over at the sheriff's department in Hamblen County, he's [the defendant's] confronted with the fact that

Ralph Thompson has admitted his involvement and guilt in the death of Lisa Stephenson.

The defendant objected to this remark as a violation of his right to confrontation and moved for a mistrial. The trial court overruled the objection and gave the jury a curative instruction that they should consider the out-of-court statement only on the issues of whether it was made and its effect on the defendant's actions.

At trial, T.B.I. Agent David Davenport said that the defendant was being questioned after having given two earlier exculpatory statements. Over objection, Davenport testified that the defendant was told that Thompson had given a statement involving himself in the victim's murder. Davenport related that the defendant first confronted Thompson and confirmed his statement and that the defendant then gave a third statement, which was substantially different from the two given earlier. Davenport then read the third statement to the jury. Davenport also said that when the defendant learned Robertson was no longer supporting his alibi, he later gave a fourth statement admitting involvement in the murder for the first time.

After this fourth and final statement of the defendant was read to the jury, the trial court gave the jury a limiting instruction concerning the use of out-of-court, unsworn, unexamined statements. The judge told the jury that evidence of the existence and nature of Thompson's statement was admitted only to show what was directly said to Stephenson and to assist the jury in evaluating Stephenson's response. The court charged the jury that they absolutely could not consider Thompson's admission of his own guilt to be true for any purpose.

The defendant alleges that the admission into evidence of these references to Thompson's statement violates his right of confrontation under the Sixth Amendment to the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him."

As the State points out in its brief, this case is analogous to *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), in which a detailed statement by a non-testifying co-defendant was admitted to rebut the defendant's contention that his own confession had been based upon the co-defendant's statement. The United States Supreme Court held that the non-hearsay aspect of the co-defendant's confession—offered not to prove what happened at the murder scene but to prove what happened when the defendant confessed—raised no Confrontation Clause concerns. *Id.* at 417, 105 S.Ct. at 2081–82. The real problem was the potential misuse of the statement by the jury, which was solved by the court's limiting instruction. *Id.* at 418, 105 S.Ct. at 2082. The Court examined whether the use of the statement hampered or helped the "accuracy of the truth-determining process" and whether there were any alternatives to the manner in which the statement was used. It concluded that the evidence was properly admitted for nonhearsay purposes. *Id.*

Examining the facts in this record in accordance with the analysis utilized in *Street,* we conclude that the defendant's Sixth Amendment right of confrontation was not violated. Thompson's statement that he had been involved in the victim's murder was not introduced to prove that Ralph Thompson had participated in the murder or to show that he had implicated the defendant, but was used to show the defendant's reaction when confronted with Thompson's statement. The court gave extensive limiting instructions soon after the remarks during opening statement and after the testimony concerning the out-of-court statements. Similar instructions were given during the final charge to the jury. Finally, allowing the jury to learn that Stephenson was informed that Thompson had given a statement admitting his own involvement in the killing assisted the jury in its evaluation of Stephenson's later statements. The trial court did not err by admitting this evidence.

## L. Lesser Included Offenses Charge

 In the present case, the trial court charged the jury only as to first and second degree murder. The defendant argues that he was entitled to a charge on all lesser degrees of homicide and particularly

urges that an instruction on lesser offenses was necessary because there was proof that his wife's death was not intended. Where the evidence in a record clearly shows that the defendant was guilty of the greater offense and is devoid of any evidence permitting an inference of guilt of the lesser offense, the trial court's failure to charge on a lesser offense is not error. *State v. Boyd*, 797 S.W.2d 589, 593 (Tenn.1990); *State v. King*, 718 S.W.2d 241, 245 (Tenn.1986).

The record in this case is devoid of any evidence to support an inference of voluntary manslaughter or criminally negligent homicide. *See* Tenn.Code Ann. §§ 39–13–211 and 39–13–212 (1991). Failure of the trial court to instruct the jury on these offenses was not error.

## PART II.

### SENTENCING PHASE—TRIAL ERRORS

#### A. Allocution

■ The defendant unsuccessfully moved that he be allowed to address the jury at sentencing without being cross-examined by the State. He asserts on appeal that the trial court's refusal denied him his common-law, statutory and constitutional rights of allocution.

The common-law right to allocution[3] has been defined as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction. *Black's Law Dictionary*, 76 (6th ed. 1990). Sentencing, at common law, was not set at the court's discretion; and the death penalty was routinely imposed for felony offenses. *See State v. Carr*, 172 Conn. 458, 374 A.2d 1107, 1115

(1977). Moreover, at the time of the origin of the right, allocution was a criminal defendant's only opportunity to address the court because a defendant had no right to counsel and was incompetent to testify. *Harris v. State*, 306 Md. 344, 509 A.2d 120, 123–27 (1986). The right of allocution afforded the defendant a formal opportunity to disclose to the court, before it pronounced sentence, one of the strictly defined legal grounds for avoiding or delaying the sentence, such as misidentification, benefit of clergy or pardon, insanity, or pregnancy. *Carr*, 374 A.2d at 1116. Pregnancy merely delayed imposition of sentence, whereas benefit of the clergy was a jurisdictional issue. Members of the clergy were immune from the jurisdiction of secular courts in England. *Black's Law Dictionary*, 158 (6th ed. 1990). In spite of its limitations, allocution at common law was considered an essential procedural right; and the failure to ask a defendant whether there was any reason why judgment should not be pronounced against him or her was held reversible error, at least in capital cases. *Harris*, 509 A.2d at 123–27.[4] As trial courts were given greater discretion in sentencing, some jurisdictions broadened the scope of allocution to allow a criminal defendant to inform the court of mitigating factors relevant to sentencing or to plead for leniency. *Id.*

In many jurisdictions the common-law right of allocution is now embodied in a statute or rule of criminal procedure.[5] Some of the provisions, such as those adopted in Texas, Puerto Rico, and California follow the common-law right of allocution in that a defendant is only asked whether there is any legal cause to show why judgment should not be pronounced against him. Others, such as the Wisconsin statute and the federal rule,

---

**3.** The doctrine is said to be based on the four early cases of *Rex v. Royce*, 4 Burr. 2073, 98 Eng.Rep. 81 (K.B.1767); *The King v. Speke*, 3 Salk. 358, 91 Eng.Rep. 872 (K.B. 1689–1712); *Rex & Regina v. Geary*, 2 Salk. 630, 91 Eng.Rep. 532 (K.B. 1689–1712); *Anonymous*, 3 Mod. 265, 87 Eng.Rep. 175 (K.B. 1669–1732). *See* P. Barret, *Allocution*, 9 Mo.L.Rev. 115, 121 (1944).

**4.** On the history of allocution in general also see *Boardman v. Estelle*, 957 F.2d 1523 (9th Cir. 1992) (federal law); *Harvey v. State*, 835 P.2d 1074, 1085–92 (Wyo.1992) (Urbigkit, C.J., dis-

senting); Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy*, 15 N.M.L.Rev. 41, 56–57 (1985).

**5.** *See e.g.* Fed.R.Crim.P. 32(a)(1)(C); Ark.Code Ann. § 16–90–106(b); Cal.Penal Code § 1200; Colo.R.Crim.P. 32(b); Mo.Rev.Stat. § 546.570; N.Y.Crim.Proc.Law § 380.50; P.R.Laws Ann. tit. 34, & 168; Tex.Crim.Proc.Code Ann. § 42.07; Wis.Stat. § 972.14(2); *see also Harvey*, 835 P.2d at 1092 (listing some jurisdictions).

allow a defendant to make a statement and present information in mitigation of the sentence.

Some states have concluded that allocution is a right protected by their state constitutions. *See DeAngelo v. Schiedler*, 306 Or. 91, 757 P.2d 1355, 1356–80 (1988) (judge sentencing in capital case); *State v. Nicoletti*, 471 A.2d 613 (R.I.1984) (noncapital case); *Harvey v. State*, 835 P.2d 1074, 1081–82 (Wyo. 1992) (noncapital). Others have found that the common-law right allows a capital defendant to address his or her sentencers. *See, e.g., Harris*, 509 A.2d at 123–27; *Homick v. State*, 108 Nev. 127, 825 P.2d 600, 603–05 (1992); *State v. Zola*, 112 N.J. 384, 548 A.2d 1022, 1044–46 (1988); *See also People v. Borrego*, 774 P.2d 854, 856 (Colo.1989) (under rule); *Williams v. State*, 445 So.2d 798, 813–14 (Miss.1984) (mentions that defendant allowed to make unsworn statement to jury, no discussion regarding source of right); *State v. Lord*, 117 Wash.2d 829, 822 P.2d 177, 216–17 (1991) (allocution in capital case, under rule); *State v. Mak*, 105 Wash.2d 692, 718 P.2d 407, 430 (1986).

Other state courts, however, have concluded that there is no common-law or constitutional right of allocution allowing a capital defendant to address the jury. *See, e.g., People v. Nicolaus*, 54 Cal.3d 551, 286 Cal. Rptr. 628, 645, 817 P.2d 893, 910 (1991); *People v. Keenan*, 46 Cal.3d 478, 250 Cal. Rptr. 550, 758 P.2d 1081, 1101–02 (1988); *People v. Robbins*, 45 Cal.3d 867, 248 Cal. Rptr. 172, 184–86, 755 P.2d 355, 368–69 (1988); *People v. Kokoraleis*, 132 Ill.2d 235, 138 Ill.Dec. 233, 254–55, 547 N.E.2d 202, 223–24 (1989); *People v. Gaines*, 88 Ill.2d 342, 58 Ill.Dec. 795, 811–14, 430 N.E.2d 1046, 1062–65 (1981); *State v. Whitfield*, 837 S.W.2d 503, 514 (Mo.1992) (*en banc*); *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846, 857–58 (1989); *Bassett v. Commonwealth*, 222 Va. 844, 284 S.E.2d 844, 853 (1981). *See also* generally on this issue 3 ABA Standards for Criminal Justice, Standard 19–6.4(a)(iii) (2d ed. 1980), and 3 LaFave & Israel, *Criminal Procedure*, § 25.1(f) (1984).

Likewise, the federal circuits are split on whether the right of allocution expressly provided by Rule 32(a) of the Federal Rules of Criminal Procedure is also a right guaranteed by the Due Process Clause of the Fourteenth Amendment to the Constitution. *Compare Boardman v. Estelle*, 957 F.2d 1523 (9th Cir.1992) (allocution is a right guaranteed by the due process clause of the Constitution); and *United States v. Coffey*, 871 F.2d 39, 40 (6th Cir.1989) (no constitutional basis for allocution).

We must now determine whether a defendant in a capital case in Tennessee has a statutory, common law, or constitutional right to allocution. In the present case, the defendant, relying upon Tenn.Code Ann. § 40–35–210(b)(6) (1991), claims a statutory right of allocution. The defendant's reliance is misplaced. That statute provides that the trial judge, in determining the appropriate sentence in a *noncapital* case, shall consider, among several factors, "[a]ny statement the defendant wishes to make in his own behalf about sentencing." *Id.* There is no similar statute or rule in Tennessee mandating that a capital defendant be allowed allocution before a capital sentencing jury.

There appears to be only one case in Tennessee specifically addressing the common-law right of allocution. In 1873, this Court, in a noncapital case entitled *State v. Henry and Frazier*, 65 Tenn. 539, 544 (1873), stated that allocution had been kept up "as a matter of form, but [that it] has nothing in it" under the Tennessee rule, where attorneys are afforded the defendant. Thus, the common-law right of allocution has long been abandoned in Tennessee.

Moreover, our review of the case law convinces us that a capital defendant does not have a federal or state constitutional right to make an unsworn statement to a jury in the sentencing phase of a capital trial. As stated above, the federal circuits are split on whether allocution is protected by the due process clause of the federal constitution. There is no definitive decision from the U.S. Supreme Court on the issue. However, in a noncapital case, *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Court clearly held that allocution is not a constitutional right. There the Court said that even where the federal rule of criminal procedure established the right, the failure of the trial

judge to perform allocution "is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure." *Id.,* 368 U.S. at 428, 82 S.Ct. at 471. This statement is consistent with our own understanding of the common-law right.

In *State v. Burkhart,* 541 S.W.2d 365 (Tenn.1976), this Court examined whether a criminal defendant who is represented by counsel has a constitutional right to cross-examine witnesses and to argue his own case. *Id.* at 366. Although *Burkhart* was a non-capital case, it is relevant here because it dealt with the issue of whether a criminal defendant has a state or federal constitutional right to make an unsworn statement to the jury. The defendant in that case based his claim to the right upon the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution, which provides that "the accused hath the right to be heard by himself and his counsel; . . . ." The *Burkhart* court discussed the historical background of the rules relating to the testimony of a criminal defendant and his right to counsel. Specifically, the court noted that at common law, criminal defendants were not allowed to testify, or call witnesses, or be represented by counsel. *Id.* at 366.

The *Burkhart* court held that Article I, Section 9 was designed to ameliorate the rigorous rules of the common law. *Id.* at 371. The court stated that the framers "intended to insure that every accused citizen enjoyed the benefit of counsel and a correlative right to be heard in person. At that time these rights were recognized by giving to the defendant the right to make an unsworn statement and to argue his case, and the simultaneous right to be heard by counsel." *Id.* The court stated that a criminal defendant has essentially the same rights in Tennessee today with the distinction being that criminal trial procedure has been refined to allow the defendant the right to be a sworn witness testifying in his own behalf. *Id.* The *Burkhart* court opined that the Tennessee constitutional provision "[p]araphrased . . . might now read: In all criminal

prosecutions the accused has the right to testify as a witness in his own behalf and to be represented by counsel." *Id.* With regard to the criminal defendant's right to make an unsworn statement to the jury, the court in *Burkhart* specifically stated:

> He does not have a constitutional right to make an unsworn statement. Quite aside from the fact that such a statement would be of questionable value, there is for consideration the patent unfairness to the State of permitting a defendant to make an unsworn statement, not subject to cross-examination, and without leave for the State to comment upon his failure to testify in the regular manner. The State too has an interest in a fair trial.

*Id.* at 371; *see also State v. Franklin,* 714 S.W.2d 252 (Tenn.1986) (agreeing with *Burkhart* that a defendant has no absolute right to make an unsworn statement to the jury).

We agree that the rationale and conclusion of the *Burkhart* court should apply in this capital case. The practice of allowing unsworn statements was designed to alleviate the harshness of common-law rules. The practice is no longer necessary or desirable in light of the abolition of those harsh rules and the development of rules protecting the rights of criminal defendants. Moreover, allocution is not necessary to protect the right of a capital defendant to present mitigating evidence in person to the sentencing jury. We have recently held in *State v. Cazes,* 875 S.W.2d 253 (1994) that cross-examination of a capital defendant at the sentencing trial is limited to the subject matter discussed on direct examination. Accordingly, a capital defendant may present mitigating evidence at the sentencing hearing and have cross-examination limited to that issue. Based on the foregoing, we conclude that there is no statutory, common-law, or constitutional right to allocution in a capital case. The trial court properly denied the defendant's motion.

### B. Instructional Errors

Both the criminal offense and the trial in this case occurred after the effective date of the 1989 amendments to Tennessee's capital sentencing statute. Under these amend-

ments, before a jury may sentence a defendant to death, it must find that the State "has proven *beyond a reasonable doubt* that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn.Code Ann. § 39–13–204(g)(2)(B) (1991) (emphasis added). While the trial court in this case instructed the jury that aggravating circumstances must outweigh mitigating circumstances before a sentence of death could be imposed, the "beyond a reasonable doubt" standard was omitted from the instructions. Later, when the jury was charged regarding imposition of a life sentence, the court did instruct the reasonable doubt standard by charging: "[I]f the jury unanimously ... determines ... that said statutory aggravating circumstance did not outweigh beyond a reasonable doubt one or more mitigating circumstances, the sentence shall be life imprisonment."

Before deliberations began, the trial court submitted to the jury a pre–1989 verdict form, which contained the following language:

We, the jury, unanimously find that there are no mitigating circumstances sufficiently substantial to balance or outweigh the statutory aggravating circumstance or circumstances listed above. Therefore, we, the jury unanimously find that the punishment shall be death by electrocution for the offense of murder in the first degree.

After deliberations, the trial jury made the finding set out above, which contained no standard of proof for the weighing process. All twelve jurors personally signed the finding and verdict. The proper verdict form would have required the jury to find that the State had proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweighed any mitigating circumstances. Tenn.Code Ann. § 39–13–204(g)(2)(B) (1991).

Upon being notified by the defendant after the trial was over that the wrong verdict form had been used, the court, over defendant's objections, held a hearing on November 2, 1990, fourteen days after the verdict had been rendered and the jury discharged. The court recalled and, with counsel, examined each juror who had heard the case to ascertain whether the verdict form had affected the jurors' verdict and whether the jury had applied the correct standard. While the trial court initially called use of the verdict form "clear error" and "fundamental error," the court eventually found that the defendant had not been prejudiced by the form or by its omission of the beyond a reasonable doubt standard. The court made no finding regarding omission of the beyond a reasonable doubt standard in the charge itself. Statements at the post-trial hearing indicated that the trial judge apparently believed that the jury had been correctly charged and that the only error was the verdict form itself.

The State initially argues that the defendant's failure to object to the omission of the reasonable doubt standard in the charge and to the use of the pre–1989 verdict form constituted waiver. The State also claims that the testimony of the jurors at the post-trial hearing demonstrates that any error in the charge or verdict form was harmless beyond a reasonable doubt.

On the other hand, the defendant asserts that the post-trial inquiry was not a valid proceeding and that the trial court should not have recalled the jurors and examined them as to their deliberations. He likens what occurred to allowing a jury or judge to amend or correct an invalid verdict after discharge. *See, e.g., State v. Williams,* 490 S.W.2d 519 (1973); *Riley v. State,* 189 Tenn. 697, 227 S.W.2d 32 (1950); *State v. Morris,* 788 S.W.2d 820 (Tenn.Crim.App.1990). He also argues that the situation is akin to that where a jury's special verdict conflicts with that jury's general verdict.

■ As a preliminary matter, we note that the State's contention that the issue is waived because of the defendant's failure to raise the issue at the time of the charge or in the motion for new trial is completely without merit. We conclude, as the trial court judge did initially, that use of the improper verdict form and the outdated instructions constituted "clear error" and "fundamental error," which may be noticed by an appellate court under either the "plain error" or "fundamental error" doctrine. The "plain error" doc-

trine is embodied in Tennessee Rule of Criminal Procedure 52(b) which provides:

> (b) Plain Error.—An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.

The plain error rule has been previously applied by this Court to allow review of patently incomplete instructions at a capital sentencing hearing despite defense counsel's failure to call such error to the trial court's attention. *See State v. Hines,* 758 S.W.2d 515, 523–24 & Note 4 (Tenn.1988). The fundamental error rule originated in the case law of this State and generally refers to the proposition that a trial court judge's failure to give a jury charge on matters characterized as "fundamental" may be found to be error requiring reversal despite the fact that the defendant did not request the omitted instructions. The fundamental error rule has been applied to a variety of instructional omissions, including prior inconsistent statements offered for impeachment, circumstantial evidence, weight of a dying declaration, and guilt beyond a reasonable doubt. *See, e.g., State v. Reece,* 637 S.W.2d 858, 861 (Tenn.1982); *Bunch v. State,* 499 S.W.2d 1, 3 (Tenn.1973); *Pearson v. State,* 143 Tenn. 385, 226 S.W. 538 (Tenn.1920); and *Frazier v. State,* 117 Tenn. 430, 100 S.W. 94 (Tenn. 1907). Clearly, the defendant's failure to raise the issue in the motion for a new trial does not constitute waiver under the facts in this case.

 Moreover, we agree with the defendant that the post-trial hearing after discharging the jury, relied upon by the State as evidence that the error was harmless, was a clearly invalid proceeding. The hearing presents the reverse of the more common case, where a defendant attempts to show by affidavit or testimony that a juror misunderstood a correct instruction. It is obvious, in that situation, that the juror is not allowed to impeach his or her verdict. *See, e.g., State v. Johnson,* 632 S.W.2d 542, 549 (Tenn.1982); *State v. Ward,* 663 S.W.2d 805, 808 (Tenn. Crim.App.1983). In this case, the trial court allowed the jurors' testimony on the issue of whether incorrect instructions or material considered by the jurors affected their verdict. The trial judge characterized his questioning of the former jurors as an attempt to "affirm" the verdict rather than to "impeach" it.

 Initially, we note that when a jury returns an incorrect or imperfect verdict, the trial court has both the power and the duty to send them back to the jury room with directions to amend the verdict to put it in the proper form. *State v. Mounce,* 859 S.W.2d 319, 322 (Tenn.1993) (quoting *Meade v. State,* 530 S.W.2d 784, 787 (Tenn.Crim. App.1975)). However, once a jury in a felony case has been discharged and outside contacts may have occurred, the jury may not be reconvened for the purpose of taking further action involving the accused. *Clark v. State,* 170 Tenn. 494, 97 S.W.2d 644, 646 (Tenn. 1936); *Long v. State,* 132 Tenn. 649, 179 S.W. 315 (Tenn.1915). Although the trial judge here technically did not reconvene the jury for further sentencing deliberations, his action was improper.

Tennessee Rule of Evidence 606(b) expressly prohibits, upon an inquiry into the validity of a verdict, a juror's testimony as to *"any matter or statement occurring during the course of a jury's deliberations or to the effect of anything upon the juror's mind or emotion as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes,"* except for testimony concerning extraneous prejudicial information, outside influences, or an agreement to be bound by a quotient verdict. The inquiry conducted by the trial judge in this case violated that rule. *Cf. State v. Thomas,* 813 S.W.2d 395, 396 (Tenn.1991) (limiting post-verdict investigation and interviewing of former jurors to those matters allowed under Rule 606(b), Tenn.R.Evid.). As a result, the information gathered from examination of the jurors clearly should not have been considered by the trial court in determining whether the plain and fundamental error was harmless.

 We next must consider whether the errors complained of require reversal.

We begin our analysis of the issue with the proposition that under Tennessee law, a criminal defendant has the right to have a correct and complete charge of the law given to the jury by the trial judge. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990); *State v. Bryant*, 654 S.W.2d 389, 390 (Tenn.1983). In determining whether a defendant has been afforded that right, the jury charge will be "viewed in its entirety" or "considered as a whole." *Otis v. Cambridge Mutual Fire Insurance Co.* 850 S.W.2d 439, 446 (Tenn.1992); *Abbott v. American Honda Motor Co. Inc.*, 682 S.W.2d 206, 209 (Tenn.App.1984). In that respect, the State says that when the jury charge in this case is considered as a whole, the defendant was not deprived of his right to a correct and complete charge of the law because the correct and applicable standard was embodied in the life sentence instruction. We disagree.

Long ago, this Court established the rule that inconsistent or contradictory instructions "do not neutralize or validate each other, but are vitally erroneous.... The parties are entitled to a clear and consistent charge, as well as a correct one, that justice may be reached." *Citizens Street Railroad Co. v. Shepherd*, 107 Tenn. 444, 64 S.W. 710, 711 (1901). This principle was more recently discussed in *Abbott*, in which the Court of Appeals stated:

> Instructions as a whole must be consistent and harmonious, not conflicting and contradictory.... Where instructions given to the jury for their guidance present contradictory and conflicting rules which are unexplained, and where following one would or might lead to a different result than would obtain by following the other, the instructions are inherently defective. This is true although one of the instructions correctly states the law applicable to the facts of the case, since the correct instruction cannot cure the error in the contradictory erroneous instruction....

682 S.W.2d at 209, quoting 75 Am.Jur.2d *Trial* § 628, 920 (1974), and citing 88 C.J.S. *Trial* § 338–39 (1955). Reviewing the charge in this case under the standard set forth above, it is clear that the jury instructions, which omitted the "beyond a reasonable doubt" standard from that portion of the charge instructing the jury how to determine whether the death penalty should be imposed, are at the very least inconsistent and misleading, if not in direct conflict.

Another, even more fundamental error occurred when a pre–1989 jury verdict form was submitted to the jury by the trial judge. The jury returned its verdict using this form, which imposed a sentence of death upon a finding that "there are no mitigating circumstances sufficiently substantial to balance or outweigh the statutory aggravating circumstance or circumstances listed above." The 1989 legislative amendments to the capital sentencing statute, however, provide for imposition of the death penalty *only* upon a unanimous jury finding that the statutory aggravating circumstance or circumstances proven by the State outweigh any mitigating circumstances beyond a reasonable doubt. Tenn.Code Ann. § 39–13–204(g)(2)(B) (1991). The statute also mandates that the jury signify on the verdict form that "the state has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh any mitigating circumstances." Tenn.Code Ann. §§ 39–13–204(g)(2)(A)(ii) and –204(g)(2)(B) (1991).

The jury's verdict in this case was facially void because it in no way complied with the requirements of the applicable law. The problem in this case is very similar to one we faced in *State v. Williams*, 575 S.W.2d 948, 949 (Tenn.1979), where the jury should have been instructed that murder in the second degree was punishable by a determinate sentence of life or any number of years not less than ten, with the precise sentence to be fixed by the jury. Instead, the trial judge erroneously charged the jury that, upon conviction of second-degree murder, the defendant would be subject to an indeterminate sentence of not less than ten nor more than twenty years. The jury returned a sentence of "not less than 10 nor more than 15 years." The trial court accepted the verdict and discharged the jury. This Court held that the verdict was facially void because it in no way complied with the requirement of the determinate sentence law in effect at the time of sentencing. The case was remanded to the

trial court for a new trial limited to the single issue of punishment because this Court concluded "a legal punishment" had not been fixed. *Id.* at 950.

■ We are faced in this case with a similar situation—a jury verdict which is not authorized by law. Although not constitutionally required, *see State v. Payne*, 791 S.W.2d 10, 21 (Tenn.1990), the legislature has seen fit to provide the benefit of the highest standard of proof, the "beyond a reasonable doubt standard," to all capital defendants being sentenced to any offenses committed after the effective date of the 1989 legislative amendments. The defendant here was deprived of the benefit of the higher standard of proof because the trial court judge commingled the pre–1989 law with the 1989 amended statute and compounded the error by delivering to the jury a pre–1989 verdict form upon which to make their findings. Therefore, a "legal punishment" has not been fixed. The jury's verdict was a "mere nullity" because it did not conform to the dictates of the law. When instructional errors and jury findings based on an erroneous jury verdict form combine to produce a facially void verdict, it would be a contradiction indeed to hold that the errors were harmless when the jury's verdict itself is certain evidence of prejudicial error—error affecting the verdict.

While we find the foregoing rationale sufficient to require reversal of the sentence in this case, we note that the prejudice resulting from these errors is even more fatal to the validity of sentencing in the context of a capital case. In *Murphy v. State*, 47 Tenn. 516 (1869), the jury returned a sentence for a term less than the prescribed statutory minimum. Finding the punishment imposed was not authorized by law, the Court declared the verdict, like the one in the present case, a "mere nullity." 47 Tenn. at 525. In so holding, the Court stated:

> If the least departure from the mode or extent of punishment prescribed by the law of the land for the commission of crime, is encouraged or tolerated, how great a departure will be allowed? The laws of the land prescribing the mode and extent of punishment will be practically nullified, and stand as dead letters upon the statute books; and in lieu thereof, the mode and extent of punishment which may be inflicted upon persons convicted of crime will be regulated by, depend alone upon, the taste, fancy, whim, caprice, partiality or prejudice of the particular court or jury trying the offender; and such taste, fancy, whim, caprice, partiality or prejudice, will be the law of the case.

*Id.* The Court concluded that, by allowing an illegal verdict to stand, it would condone the infliction of all sorts of punishments "all for the same character of offense." *Id.*

■ These words, written by this Court over a century ago in *Murphy*, recognize the danger of wanton and freakish sentencing posed by allowing unauthorized sentencing procedures to stand and foreshadow the special concern of modern capital jurisprudence that the death penalty not be imposed under sentencing procedures that fail to minimize wholly arbitrary and capricious action. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 188–189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). We have acknowledged that the absence of proper legal guidance at a capital sentencing proceeding invites "a certain degree of capriciousness in the deliberation." *State v. Laney*, 654 S.W.2d 383, 388 (Tenn.1983). Furthermore, under Tenn.Code Ann. § 39–13–206(c)(1)(A), this Court has been charged with assuring that a sentence of death is not imposed in any arbitrary fashion. To uphold a sentence of death, like the present one, based upon an illegal verdict form returned by a jury whose discretion was guided by contradictory and confusing instructions incompletely and inaccurately reciting the applicable law, would countenance a degree of arbitrariness and capriciousness in the defendant's death sentence incompatible with our duty under Tenn.Code Ann. § 39–13–206(c)(1)(A) (1991). Accordingly, the sentence of death is reversed and the case is remanded for resentencing.

Although the erroneous jury charge does not necessitate resentencing on the conspiracy conviction, we also remand that portion of the case for resentencing to allow the trial court judge an opportunity to make explicit findings on the record with regard to how

the sentencing principles of the 1989 Act relate to the facts in this case. *See* Tenn. Code Ann. § 40–35–209(c) and § 40–35–210(f) (1991).

### C. Alleged Unconstitutional Duplication

The defendant argues that the aggravating circumstance found by the jury in this case—the defendant employed another to commit the murder for remuneration or the promise of remuneration [6]—does not sufficiently narrow the class of death eligible offenders to withstand scrutiny under the 8th and 14th Amendments to the United States Constitution or Article I, §§ 8 and 16 of the Tennessee Constitution. *See State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). The defendant argues that the aggravating circumstance duplicates an element of the offense because the statutes defining criminal responsibility [7] must be incorporated as implicit elements of the offense in order to convict the defendant of first degree murder.

In *Middlebrooks* a majority of this Court held that, when a defendant is convicted of first-degree murder solely on the basis that the murder was committed during the course of a felony, then the felony-murder aggravating circumstance does not narrow the class of death eligible defendants because it duplicates exactly the elements of the offense supporting the conviction that made the defendant death-eligible. In this case, despite the argument of the defendant and the contentions of the dissent, the statutory aggravating circumstance found by the jury is a proper narrowing device because it provides a "principled way in which to distinguish" the cases in which the death penalty is imposed from the many cases in which it is not. *Id.* at 343. Stephenson was convicted of first-degree premeditated murder, which is defined as "an intentional, premeditated and deliberate killing of another." Tenn.Code Ann. § 39–13–202(a)(1) (1991). Stephenson's

conviction was also based on the criminal responsibility statutes, specifically, Tenn. Code Ann. § 39–11–402(2), which provides:

A person is criminally responsible for an offense committed by the conduct of another if:

. . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . .

The aggravating circumstance—the defendant employed another to commit the murder for remuneration or the promise of remuneration—does not duplicate the elements of the offense, even incorporating the criminal responsibility statutes. Constitutional narrowing is accomplished because at the sentencing hearing, the State was required to prove that this defendant hired someone to kill his wife, or promised to pay someone to kill his wife. Obviously, not every defendant who is guilty of first-degree murder pursuant to the criminal responsibility statutes has also hired another or promised to pay another to commit the murder. Thus, the aggravating circumstance found by the jury in this case narrows the class of death-eligible defendants as required by *State v. Middlebrooks, supra.*

### CONCLUSION

We have carefully considered the defendant's contentions as to alleged errors occurring during the guilt phase of the trial and conclude that none have merit. The convictions are affirmed.

As to the alleged errors occurring during the sentencing phase, we have determined that the jury instructions in this case, taken

---

**6.** Tenn.Code Ann. § 39–13–204(i)(4) (1991).

**7.** Tenn.Code Ann. § 39–11–401. "(a) A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both.

(b) Each party to an offense may be charged with commission of the offense."

Tenn.Code Ann. § 39–11–402. "A person is criminally responsible for an offense committed by the conduct of another if:

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . ."

as a whole, were erroneous because the jury was not given a complete and correct charge on the applicable law as to the burden of proof required—i.e., beyond a reasonable doubt—before imposing the death penalty. That error was compounded when the jury made its findings and returned its verdict on a pre–1989 jury verdict form which also omitted the beyond a reasonable doubt standard. The result is a facially void verdict based on a lower standard of proof than that provided by law resulting in prejudicial error affecting the verdict. We are unable to conclude that such a fundamental error was harmless beyond a reasonable doubt; therefore, the sentence of death is reversed and the case remanded for resentencing. All aspects of the new sentencing hearing should be conducted in conformity with this Opinion.

Because of the remand for resentencing, we do not address in detail the defendant's arguments concerning alleged prosecutorial misconduct at the sentencing phase. We also pretermit statutory review of the proportionality of the death sentence imposed against the defendant as otherwise required by Tenn.Code Ann. § 39–13–206(c)(1)(D) (1991), and decline to address the defendant's challenges to the constitutionality of the Tennessee death penalty statute. We observe, however, that most of his contentions regarding the constitutionality of the statute have been rejected in recent opinions by a majority of this Court.

The costs of this appeal are taxed to the State of Tennessee.

DROWOTA and O'BRIEN, JJ., concur.

REID, C.J., writes separate concurring and dissenting opinion.

DAUGHTREY, J., not participating.

REID, Chief Justice, concurring and dissenting.

I concur with the majority's holding that the conviction of first degree murder be affirmed. I also concur that the sentence of death be reversed, because the instruction to the jury regarding the standard of proof for imposition of the sentence of death was deficient and the sentence, therefore, was void.

In dissent, I would hold that the defendant is not death eligible because the use of the aggravating circumstance (i)(4) cannot be applied to this case.

Imposition of the sentence of death requires the finding of one or more aggravating circumstances. T.C.A. § 39–13–204(g)(1) (Supp.1993). Consequently, if the only aggravating circumstance relied upon by the State is found to be invalid or inapplicable to this case, the defendant cannot be sentenced to death.

The aggravating circumstance relied upon by the prosecution is invalid because it fails to accomplish the constitutional mandate to narrow the class of death-eligible murderers. The Court stated in State v. Middlebrooks, 840 S.W.2d 317, 343 (Tenn.1992):

> As a constitutionally necessary first step under the Eighth Amendment, the Supreme Court has required the states to narrow the sentencers' consideration of the death penalty to a smaller, more culpable class of homicide defendants than the pre-*Furman* class of death-eligible murderers. See *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). A state, however, must not only genuinely narrow the class of death eligible defendants, but must do so in a way that reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Zant v. Stephens,* [462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983) ].

And further:

> Tennessee has not chosen to narrow the class of death-eligible defendants by redefining its murder statute, but rather has chosen to do so by listing a number of specific aggravating factors and expressly requiring the finding of at least one aggravating circumstance beyond a reasonable doubt before the death penalty can be imposed. It joins 24 other states in that requirement.

*Id.* at 344. It would appear from this statement of the law that an aggravating circumstance, in order to be valid, must "genuinely narrow" the class of death-eligible defendants.

Examination of the statutes upon which the conviction and sentence in this case are based, shows that the same acts constitute the offense and the aggravating circumstance. Defendant was convicted of first degree murder as defined by T.C.A. § 39–13–202(a)(1) (Supp.1993), which provides:

(a) First degree murder is:

(1) An intentional, premeditated and deliberate killing of another.

Even though the defendant did not kill the victim, guilt has been imposed upon him by T.C.A. § 39–11–402 (1991), the pertinent portions of which are:

A person is criminally responsible for an offense committed by the conduct of another if:

. . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense. . . .

The jury found only one aggravating circumstance, which T.C.A. § 39–13–204(i)(4) defines as follows:

The defendant ... employed another to commit the murder for remuneration or the promise of remuneration.

By employing Thompson to kill the defendant's wife, the defendant became guilty upon the act being committed. By employing Thompson to kill his wife, the defendant also committed the aggravating circumstance. Obviously, the same facts establish the crime and the aggravating circumstance; and, the aggravating circumstance adds no culpability beyond that necessary to establish first degree murder.

In *Middlebrooks*, in which the aggravating circumstance was found to be invalid, the same facts established the crime and the aggravating circumstance, but the "essential elements" of the crime and the aggravating circumstance were the same also. The opinion in *Middlebrooks* relied upon the duplication of the essential elements to declare the aggravating circumstance invalid. *State v. Middlebrooks*, 840 S.W.2d at 346.

The majority opinion in this case follows *Middlebrooks* and finds that the aggravating circumstance in this case is valid, not because it, in fact, narrows the class of death-eligible murderers, but because the "aggravating circumstance found by the jury in this case clearly does not duplicate the statutory elements of the offense." Opinion p. 557. Consequently, as stated in dissent in *Middlebrooks*, the decision in that case was only a partial solution to the constitutional problem addressed.

It should be noted that the constitutional deficiency is that the aggravating circumstance does not narrow the class, not that it duplicates the elements of the offense. . . . The result then is illogical: an aggravating circumstance that fails to narrow the class because it duplicates the elements of the offense is unconstitutional, but aggravating circumstances that fail to narrow the class for other reasons are not unconstitutional. The logical conclusion from the majority Opinion's analysis would be that any provision of the statute that fails to accomplish the constitutional imperative to narrow the class is invalid.

*State v. Middlebrooks*, 840 S.W.2d at 352 (Reid, C.J., concurring and dissenting). The result of the majority opinion is to abandon the central principle announced in *Middlebrooks*:

A proper narrowing device, therefore, provides a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not, *Godfrey v. Georgia*, [446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980)], and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed.

*Id.* at 343. To validate an aggravating circumstance because the "essential elements" are not identical to those of the offense, even though the aggravating circumstance does not in fact narrow the class, hardly seems to be a principled and substantially rational compliance with the constitutional imperative.

For these reasons, I would find that the defendant is not death-eligible and impose a sentence of life imprisonment.

## ORDER ON PETITION FOR REHEARING

PER CURIAM.

The appellant, Jonathan Wesley Stephenson, has filed a petition for rehearing in this cause, which the Court has considered and concludes should be denied.

It is so ORDERED.

DAUGHTREY, J., not participating.