# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Brief May 10, 2000

## STATE OF TENNESSEE v. FLOYD LEE PERRY, JR.

**Appeal as of Right  from the Circuit Court for Obion County**
**No. 8-438      William B. Acree, Judge**

---

### No. W1999-01715-CCA-R3-CD - Filed October 23, 2000

---

The defendant and appellant, Floyd Lee Perry, Jr., was indicted by an Obion County Grand Jury for first-degree murder, first-degree murder in the perpetration of a robbery, and especially aggravated robbery. Following a jury trial, the defendant was convicted of first-degree murder in the perpetration of a robbery, especially aggravated robbery, and second-degree murder (as a lesser included offense of first-degree murder). The trial court merged the second-degree murder conviction into the first-degree felony murder conviction and, following a sentencing hearing, sentenced the defendant to life imprisonment for felony murder and twenty-three (23) years for especially aggravated robbery. The court ordered the sentences to be served concurrently. On appeal, the appellant claims (1) that the evidence was insufficient to support his convictions, and (2) that the trial court erred by allowing the state to introduce prejudicial autopsy photographs in evidence. After a thorough review of the record, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court of Obion County is Affirmed

JERRY SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR.,  and ROBERT W. WEDEMEYER, JJ., joined.

Clifford K. McGown, Waverly, Tennessee, on appeal only; and Joseph P. Atnip, District Public Defender, Dresden, Tennessee, at trial, for appellant, Floyd Lee Perry, Jr.

Paul G. Summers, Attorney General & Reporter, Mark E. Davidson, Assistant Attorney General, Nashville, Tennessee and Thomas A. Thomas, District Attorney General and Jim Cannon, Assistant District Attorney, Union City, Tennessee, for the appellee, State of Tennessee.

# OPINION

## Factual Background

At trial, the state's first witness was Carolyn Yates, the victim's mother. She told the jury that her son Christopher was right-handed. Ms. Yates was aware that her son used drugs. She claimed that he had never owned a gun. Ms. Yates testified that Christopher had been fired from his job with the city because he had been in jail and missed work. She also testified that, as a result of the firing, Christopher had received a check from the city for his retirement benefits a few days before he died.

Next, the state called Brenda Dean, the victim's girlfriend. Ms. Dean had lived with Mr. Yates for several years and was living with him on April 16, 1998, the day he was shot. Ms. Dean testified that, as a result of leaving his employment with the city, Mr. Yates received a check for about thirty-five hundred dollars ($3500.00) representing the money in his retirement account. The couple had recently taken a trip and spent over two-thousand dollars ($2000.00) of that money, but Mr. Yates still had the remainder. The day Mr. Yates was killed, Ms. Dean saw Mr. Yates put a money clip with about twelve-hundred dollars ($1200.00) in his pants pocket. Ms. Dean confirmed that Mr. Yates was right-handed, and that he did not own a gun. On cross-examination, Ms. Dean admitted that Mr. Yates had a drug problem and that he often carried cash. She testified that Mr. Yates had often visited Fay Shields in the past to buy crack cocaine.

The state's next witness was Deborah C. Downey. Ms. Downey worked at a local convenience store and had known Mr. Yates for several years prior to his death. On April 16, 1998, Ms. Downey was working at the store when Mr. Yates came in and bought beer and cigarettes. Ms. Downey testified that Mr. Yates showed her a large amount of cash when he paid for the items Although she did not know how much he had, she said it was "a big wad of money . . . hundreds and twenties." Finally, Ms. Downey testified that although she did not know what kind of car Mr. Yates drove until after the murders, she knew it was a "little red car."

Next, the state called Alice Fay Shields. Although Ms. Shields was incarcerated at the time of trial, she testified that, prior to her incarceration, she lived in Union City and sold crack cocaine. She told the jury that she and Chris Yates were friends before he was killed. On April 16, 1998, Mr. Yates came to Ms. Shields's house to buy crack cocaine from her. Ms. Shields was in her house with her daughter and someone named Jeff Clark. Ms. Shields left her house briefly, and when she returned, the defendant had arrived and was talking to Mr. Yates. Mr. Yates pulled a "wad of money" from his right-hand pocket gave Ms Shields a one-hundred (100) dollar bill to purchase crack cocaine. Ms. Shields guessed that Mr. Yates had about twelve-hundred dollars ($1200.00) altogether. Ms. Shields then took the one-hundred dollar bill and left. She came back about fifteen (15) minutes later. When she returned, Mr. Yates and the defendant were both gone, and Mr. Yates's car was gone. She testified that Mr. Yates drove a small red car.

The state's next witness was Shunita Shields, Alice Fay Shields's fifteen (15) year-old daughter. On April 16, 1998, Shunita was at her mother's house. Shunita testified that Mr. Yates came to her mother's house that night, and, shortly after Mr. Yates arrived, the defendant came to the house. Shunita told the jury that her mother left, and then the defendant and Mr. Yates left.

Next, the state called Cassandra Shields, Alice Fay Shields's eighteen (18) year-old daughter. At the time of the murder, Cassandra and the defendant were friends. On April 16, 1998, Cassandra was at a friend's apartment near Melrose Street when the defendant came to see her. Cassandra testified that the defendant called her outside the apartment. Once she came outside, the defendant told Cassandra "act like you're giving me something, cause this man's got a lot of money and I'm fixin' to take it from him." Cassandra could see a small red car in the parking lot, but she could not see who was in it. Cassandra then went back inside her friend's apartment. About forty-five (45) seconds later, a friend of Cassandra's who had just left the apartment came back in and told Cassandra that he heard gunshots. Cassandra and several friends ran up the street and saw Mr. Yates lying in the middle of the street. She could not remember where Mr. Yates's car was at that time.

Next, the state called Union City Police Corporal Lee Dearmitt. Officer Dearmitt was a Bike Patrol Officer in April 1998. He testified that, on the night of the murder, he was alerted over the radio that there had been a shooting on Melrose Street. Officer Dearmitt and another Officer went to investigate. When he arrived, Officer Dearmitt saw a body, later identified as Chris Yates, lying in the middle of Melrose Street about fifteen feet from a vehicle. The car was parked on the east side of the street, and Mr. Yates was lying perpendicular to the curb, with his head facing the east side of the street and his feet facing the west side of the street. Officer Dearmitt testified that Mr. Yates was still alive, but that he could not communicate. An ambulance came, and paramedics took over the care of Mr. Yates. Officer Dearmitt then attempted to secure the scene. As he did so, he observed a sunglass lens near Mr. Yates's body. He then observed a twenty-two caliber (.22) bullet, fully intact, on the ground beside the vehicle. He also saw a bullet hole in the windshield of the vehicle and powder burns on the inside of the windshield.

The state's next witness was Union City Police Officer Stephanie Marshall. On April 16, 1998, Officer Marshall arrived at the crime scene and saw Officer Dearmitt kneeling over Mr. Yates's body. Officer Marshall noticed a car in the street and recognized the car as belonging to Chris Yates. She went over to the passenger side of the car and found Mr. Yates's hat, his social security card, keys and vehicle registration the ground beside the car. Officer Marshall testified that she observed more papers inside the car on the floor of the passenger compartment. Finally, she found a white hat lying about seventy-five (75) feet away from the vehicle.

Next, Officer Dave Green of the Union City Police Department testified for the state. On April 16, 1998, after Chris Yates was shot, Officer Green accompanied Mr. Yates to the hospital. At the hospital, Officer Green recovered Mr. Yates's clothes and personal belongings to use as evidence. Officer Green testified that Mr. Yates did not have any money when he arrived at the hospital.

The state's next witness was Investigator Mike George of the Union City Police Department. On April 16, 1998, Officer George arrived at the crime scene after Mr. Yates had been transported to the hospital. He testified that when he arrived at the scene, he photographed Mr. Yates's vehicle, specifically the bullet hole in the windshield. Officer George showed those photographs to the jury.

Union City Chief of Police Joe Garner was the next witness for the state. Chief Garner went to the crime scene at about 10:00 p.m. on April 16, 1998. After Mr. Yates was transported to the hospital, Chief Garner went to the hospital and took pictures of Mr. Yates's left hand. The pictures depict gunshot residue on Mr. Yates's left hand. Chief Garner testified that, based on his experience

as a police officer and his knowledge that Mr. Yates was right-handed, the gunshot residue indicated that Mr. Yates's left hand was in front of the cylinder of the gun when the gun was fired.

Next, the state called Dr. O.C. Smith, a pathologist who performed the autopsy on Mr. Yates after Mr. Yates died. Dr. Smith testified that Mr. Yates died as a result of multiple gunshot wounds to the back. The first bullet grazed the back of the head and traveled downward, entering the back and lodging between two ribs on the left side. The second bullet entered the left shoulder and went through the body from left to right, damaging several organs. The third bullet entered the left shoulder and stopped when it struck the shoulder blade. The fourth and final bullet entered the left mid-back and traveled upward from left to right. Dr. Smith recovered the bullets, all of which were twenty-two caliber (.22).

Dr. Smith testified that he did not find anything that indicated that the shots were fired at close range or that the muzzle of the gun was in contact with the body when the gun was fired. The state attempted to introduce autopsy photographs showing Mr. Yates's body, and the defendant objected. After a jury-out hearing, the trial court allowed the state to introduce the photographs. After the photographs showing the bullet wounds were introduced, Dr. Smith testified that he examined Mr. Yates's hands as part of his autopsy. Both of Mr. Yates's hands contained abrasions, and the left hand also had a "sooty material" that Dr. Smith opined was gunshot residue. Dr. Smith testified that the gunshot residue was consistent with grabbing the barrel of a gun as it was being fired, and that the wounds were inconsistent with firing the gun. The state introduced pictures of Mr. Yates's hands into evidence. Finally, Dr. Smith testified that he observed "a series of bruises and skin scrapes consistent with a bite mark" on Mr. Yates's left forearm. The state introduced a photograph of the bite mark. On cross-examination, Dr. Smith testified that Mr. Yates's blood alcohol level was .08 grams per decaliter, and that Mr. Yates's reaction time would have been delayed by this.

Captain Perry Barfield of the Union City Police Department was the state's last witness. Captain Barfield testified that, two days after the shooting, a confidential informant provided information indicating that police should look for someone named "Floyd." After further investigation, police determined that "Floyd" was the defendant. On May 5, 1998, the defendant was arrested and taken into custody in Humboldt, Tennessee.

While in custody, the defendant gave a statement that was recorded by police. At first, the defendant denied that he was in Union City on the night of the murder. Later, the defendant changed his story and admitted that he was with Chris Yates the night of the shooting. The defendant told police that he attempted to buy drugs for Mr. Yates, but that the defendant left Mr. Yates and did not know what happened to Mr. Yates after that. Finally, the defendant changed his story again, admitting to police that he shot Mr. Yates. This time, however, the defendant claimed that while he was in the car with Mr. Yates, Mr. Yates tried to rob him with a pistol. He also claimed that he bit Mr. Yates in an attempt to wrestle the gun away from him, and that he shot Mr. Yates as Mr. Yates tried to charge him. The state then rested its case.

The defendant then recalled Investigator Mike George of the Union City Police Department. Officer George testified that he had tried to take a statement from Cassandra Shields in the past, but that she would not cooperate. However, after two attempts she finally gave a statement to Officer George. She told Officer George that the reason she did not give him a statement in the past was because Lieutenant Kelly had been with Officer George on previous occasions.

Next, the defendant called Javar Ross, a fourteen (14) year-old who lived on Melrose Street, to testify. Ross testified that, on April 16, 1998, he walked by a small red car. Ross was wearing a red jacket. He saw two people in the car talking. Then, he saw the two people, a white man and a black man, outside the passenger door of the car "scuffling" for a gun. At some point he heard someone yell for help. The white man had the gun at first, but eventually the black man got the gun. Ross heard one shot, and he ran away.

The defendant's next witness was Tori Nicole Smith. On April 16, 1998, Ms. Smith was on Melrose Street looking for her husband. She saw a red car and heard some people arguing near a red car, but she could not tell who. She remembered seeing a white man and "some black people." She also heard gunshots.

The defendant called Mary Whitesides, the defendant's mother, to testify. She testified that, in April of 1998, the defendant was living at his grandparents' house in Humboldt, Tennessee. She also testified that the defendant was relatively immature for his age. Ms. Whitesides told the jury that the defendant had tried to run away several times in the past. She was aware that the defendant escaped from the Obion County jail after he was arrested, and she testified that escaping was consistent with the defendant's nature, i.e, to run away. Ms. Whitesides also testified that the defendant had been shot in the past. She never knew the defendant to carry a gun.

Finally, the defendant testified. He told the jury that he had lived with Alice Fay Shields in the past. He claimed that he never owned or even borrowed a gun, because he was afraid of guns after being shot. The defendant testified that he met Chris Yates for the first time on April 16, 1998, when Mr. Yates came to Ms. Shields's house to buy crack cocaine. The defendant told the jury that he arrived after Mr. Yates, and that Ms. Shields and her daughter Shunita were in the home. The defendant claimed that Mr. Yates wanted to buy six-hundred dollars ($600.00) worth of crack cocaine from him. Because the defendant only had about three or four-hundred dollars ($300-400) worth of crack cocaine with him, he took Mr. Yates to buy some more. The defendant testified that he had been drinking that night, and that he could tell Mr. Yates had been drinking as well. Although the defendant admitted that he knew Cassandra Shields, he denied seeing her that evening. The defendant claimed that he and Mr. Yates drove to someone's house to find crack cocaine. Mr. Yates went to see if anyone was home and returned to the car after he found out no one was home. The defendant told the jury that Mr. Yates returned to the car and sat in the driver's seat. Mr. Yates again asked the defendant whether the defendant had any crack cocaine. The defendant replied that he did, but this did not satisfy Mr. Yates. Mr. Yates grabbed the defendant by the hair, aimed a gun at the defendant's face and said "give me whatcha got." The defendant then pushed the gun away from his face, and the gun discharged. They struggled for the gun, and the car began to roll backward. The defendant testified that he reached over and took the keys out of the ignition. The defendant somehow got possession of the gun, but he was trying to escape from the vehicle. He saw someone in a red jacket walking by, and he yelled for help. They continued to struggle, and the defendant bit Mr. Yates. The defendant claimed that they both managed to get out of the car on the passenger side, and Mr. Yates tried to charge the defendant. The defendant then shot Mr. Yates. He claimed that Mr. Yates did not move, so the defendant dropped the gun and ran. The defendant claimed he never robbed Mr. Yates.

After the shooting, the defendant claimed he stayed at a local motel and then fled to Kentucky. Then, he went to Humboldt, Tennessee and decided to turn himself in at the police

station. The defendant drove near the police station and had a wreck. Police then apprehended the defendant. Finally, the defendant testified that he was seventeen (17) years old when the shooting occurred.

On cross-examination, the defendant admitted that he escaped from jail after he was incarcerated for the present offense. He said he escaped because he was scared, but pointed out that he turned himself in after he escaped. Following cross-examination of the defendant, the defense rested.

On rebuttal, the state called Bobby Grimes and Tony Davis, both of whom had worked with Mr. Yates before. They both testified that Mr. Yates had a reputation as a peaceful person.

## Sufficiency

The appellant claims that the evidence adduced at trial was insufficient to support his convictions. When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). On appeal, the state is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." Id. at 779.

A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d at 75. Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the appellant to demonstrate the insufficiency of the convicting evidence. Id.

Because the appellant challenges the sufficiency of the evidence used to convict him of felony-murder, we will examine the evidence used to convict him of the underlying felony as well. Especially aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear accomplished with a deadly weapon and resulting in serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403. In this case, Mr. Yates left his house with a large amount of cash and was seen with the money later in the day. He went to Alice Fay Shields's house looking for crack cocaine, and he showed Ms. Shields about twelve-hundred dollars ($1200.00) while he was there. The defendant was present when Mr. Yates showed Ms. Shields the money. Mr. Yates left Ms. Shields's house with the defendant, and they went to find crack cocaine in Mr. Yates's car. The defendant saw a friend and told her that he was going to take Mr. Yates's money. Witnesses heard a few shots fired, and Mr. Yates was found near his car bleeding to death from four (4) gunshot wounds in the back. Mr. Yates had no money, and his personal belongings were scattered all over the street. The defendant was gone. Although the defendant initially denied even being in the area, he eventually admitted that he shot Mr. Yates. In

short, we find the evidence sufficient to support the appellant's conviction for especially aggravated robbery.

First-degree felony murder is defined in relevant part as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202 (a)(2). Furthermore, "[n]o culpable mental state is required for conviction under [the felony murder statute] except the intent to commit the enumerated offenses . . . ." Id. § 39-13-202 (b). Because the evidence was sufficient to establish that the defendant intentionally or knowingly committed especially aggravated robbery and Mr. Yates was killed in the perpetration of the robbery, the evidence was also sufficient to support the defendant's first-degree murder conviction.

Finally, the appellant challenges his conviction for second-degree murder. Second-degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (a)(1). Although the appellant does not specifically challenge the sufficiency of the evidence used to establish the "knowing" element, he claims that the state failed to disprove the defendant's theory of self-defense. He claims that, "other than the testimony of Cassandra Shields, there was no evidence that Mr. Perry initiated the conflict with Mr. Yates." In support of his argument, the appellant correctly points out that both his own and Javar Ross's testimony supported his theory. However, the jury was entitled to accept that part of the defendant's proof they felt was consistent with truth and reject that portion they believed to be false. State v. Williams, 784 S.W.2d 660, 663 (Tenn. Crim. App. 1989). In this case, the jury clearly believed the defendant when he testified that he shot Mr. Yates, but chose not to believe that the defendant acted in self-defense. Such was its province as the trier of fact. Indeed, given the fact that Mr. Yates was shot four (4) time in the back, we find the jury's choice reasonable. This issue is without merit.

### Autopsy Photographs

Next the defendant claims that the trial court erred by allowing the state to introduce autopsy photographs or Mr. Yates's body during Dr. Smith's testimony. He claims the photographs were inflammatory and unnecessary. Initially, we note that a trial court's decision regarding the admissibility of photographs will not be reversed on appeal absent a clear showing of an abuse of discretion. State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994). Moreover, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Banks, 564 S.W.2d 947, 950-951 (Tenn. 1978)(citing People v. Jenko, 410 Ill. 478, 102 N.E.2d 783 (1951)). However, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951 (citing Milam v. Commonwealth, 275 S.W.2d 921 (Ky. 1955)).

In this case, the photographs were used to illustrate the testimony of Dr. Smith concerning the location of the bullet holes. This was particularly relevant in this case, where the defendant claimed that he shot the victim in self-defense. State v. Bivens, 967 S.W.2d 821, 824 (Tenn. Crim.

App. 1996). Additionally, we note that we have reviewed the photographs, and while they are unpleasant, they are not particularly gruesome or horrifying. Thus, we find that the trial court did not abuse its discretion.

This issue is without merit.

_____

JERRY SMITH, JUDGE