IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 25, 2001

## CHARLES MITCHELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamblen County**
**No. 99CR034     James E. Beckner, Judge**

---

**No. E2000-03153-CCA-R3-PC**
**November 20, 2001**

---

The petitioner, Charles Mitchell, appeals the trial court's denial of his petition for post-conviction relief from his conviction for first degree murder and resulting sentence of life without parole. First, he contends that his mental condition prevented him from knowingly and intelligently entering his guilty plea. Second, he contends that he received the ineffective assistance of counsel because his defense attorneys (1) did not seek to suppress statements that the petitioner gave to police soon after he murdered his wife; (2) did not use diminished mental capacity in his defense; (3) induced him to plead guilty by telling him that the state had filed a notice to seek the death penalty when no such notice had been filed; and (4) failed to request a more detailed mental evaluation of him. We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Kevin W. Shepherd, Maryville, Tennessee, for the appellant, Charles Mitchell.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; C. Berkley Bell, Jr., District Attorney General; and W. Chris Scruggs, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**

On February 9, 1998, the petitioner pled guilty to premeditated first degree murder, a Class A felony. At the guilty plea hearing, the state presented the following factual account of the crime: On June 25, 1997, the petitioner beat his wife with a hose filled with lead and shot her in the head. He then wrapped the victim's body in a carpet, loaded the body into a car, and drove the car to Hamblen County. He set the car on fire, burning the victim's body beyond recognition. The next morning, the petitioner called his sister, Faye Mitchell, and told her that he had shot his wife. Faye Mitchell later called another sister, and they tried to reach the victim at work. When they could not

contact her, they called 9-1-1. Meanwhile, the petitioner had told two individuals that he shot the victim "point-blank." One witness heard the petitioner say that he shot the victim sixteen times. When the police arrived at the petitioner's business, the petitioner told them to take him to jail. The police took the petitioner to the jail and gave him his Miranda rights. The petitioner told Detective Larry Samsel that he had tried to poison his wife by putting strychnine in her coffee, but the coffee was bitter and she would not drink it. He then confessed to beating and shooting her, and he led officers to the victim's body. A physician, who positively identified the body as that of the petitioner's wife, found sixteen lead impressions in the victim's skull.

At the post-conviction hearing, the petitioner testified that he cannot read or write and only has a second-grade education. He said that he spent very little time talking with his defense attorneys about his case. He said that he pled guilty because his attorneys told him that he was going to get the death penalty and that he did not know what to do. He said that he thought that the death penalty meant that he would get life in prison. He said that at the guilty plea hearing, the judge "read out stuff," but he did not know what it meant or what to say. He said that his attorneys told him not to tell the judge that he did not understand and "just to say, yes, sir" when the judge asked him a question. He said that he did not know that by pleading guilty, he was admitting to murdering his wife and that he was going to jail for the rest of his life. He said that the Hamblen County Sheriff, Charles Long, told him that he would have the petitioner out of jail in thirty days. The petitioner testified that in prison, he sees a psychiatrist once a week and is on medication. He said that he had not taken his medication the night before or the morning of the post-conviction hearing.

On cross-examination, the petitioner said that he did not know what the Miranda rights are. When the state asked him if he remembered answering "no" to some of the judge's questions at the guilty plea hearing, he said that he might have answered "no" if his attorneys whispered that answer to him. He said that before he murdered his wife, he owned a junkyard business.

At the post-conviction hearing, the petitioner's lead trial attorney testified that at the time of the hearing, he had been licensed to practice law for twenty-three years. He said that the petitioner gave two statements to police. He said that in the first statement, the petitioner gave a detailed description of the crime. He said that in the second statement, the petitioner said that he had tried to poison his wife and that he hired someone named Jack Kennedy to kill her. The attorney stated that the petitioner indicated to him that the second statement was false. He said that the petitioner had emotional swings and that he was concerned about the petitioner's mental state. He said that the defense hired Dr. Eric Engum to evaluate the petitioner's mental condition and that Middle Tennessee Mental Health Institute also evaluated the petitioner. He said that neither evaluation supported an insanity defense and that both evaluations stated that the petitioner could assist his attorneys with his defense. He said that the petitioner assisted him with the defense.

The petitioner's lead counsel testified that the petitioner wanted to assert the defense that the victim deserved to die. He said that at times, the defendant would cry and express remorse for killing the victim. He said that a co-defendant by the name of "Rose" surfaced and that Mr. Rose stated that about a week before the petitioner killed the victim, the petitioner told Mr. Rose that he

was going to do something to the victim. He said that based on Mr. Rose's statement, evidence that the petitioner previously tried to poison the victim, lack of an insanity defense, and the brutality of the crime, he thought it would be difficult to negate premeditation and avoid the death penalty. He said that he constantly considered using diminished mental capacity in the petitioner's defense. He said that had the case gone to trial, the diminished capacity defense "would have been handy were we facing the issue between life without parole and the death penalty. But I'm not sure that it would have gotten us away from the death penalty; if we would have been successful, we would have life without parole." He said that the state agreed not to file a notice to seek the death penalty in return for the petitioner pleading guilty and receiving a sentence of life without parole. He said that he filed discovery and Brady motions in the case.

On cross-examination, the petitioner's lead counsel testified that he spent extra time with the petitioner. He said that, initially, the petitioner talked freely with the police. He said that the petitioner and several police officers, including Sheriff Long and Detective Hayes, were friends and that this may have made the petitioner unusually cooperative and trusting of the police. He acknowledged that Dr. Engum's report said that the petitioner was only "borderline capable" of consulting with his attorney. He said that because of the petitioner's mental state, he had to explain carefully the guilty plea to the petitioner and what the trial court would say at the guilty plea hearing. He said that Dr. Engum's report recommended that the petitioner receive a detailed psychological evaluation and that the petitioner got such an evaluation at Middle Tennessee Mental Health Institute. He said that if the case had gone to trial, he would have used the petitioner's diminished mental capacity to keep a jury from imposing the death penalty. He said that the petitioner's diminished mental capacity was used to get the plea agreement with the state.

The petitioner's co-counsel testified for the state that she was surprised when Dr. Engum's and Middle Tennessee Mental Health Institute's reports did not support an insanity defense. She said that the petitioner told her that if she had told him what to say, he could have convinced Dr. Engum that he was crazy. She said that lead counsel did not whisper answers to the petitioner during the guilty plea hearing. She said that at the guilty plea hearing, the petitioner may have asked her to explain some of the trial court's questions. She said that she and lead counsel explained to the petitioner what life without the possibility of parole meant. She said that lead counsel met with the petitioner for hours. She said that some days, the petitioner seemed to understand what was going on.

On cross-examination, the petitioner's co-counsel stated that she and lead counsel hired Dr. Engum to evaluate the petitioner because they were deeply concerned about the petitioner's mental state and wanted an evaluation that had no connection to the state of Tennessee. She said that Dr. Engum did a limited mental evaluation of the petitioner because the defense could not afford to pay Dr. Engum for a detailed evaluation. She said that she did not know if lead counsel considered using a diminished mental capacity defense. She said that she did not tell the petitioner that the state had filed a notice to seek the death penalty. She said that she told the petitioner that she was worried that the state would file such a notice. She said that the first time she and lead counsel met with the

petitioner, the petitioner indicated that he was worried about receiving the death penalty. She said that the state never filed a notice to seek the death penalty.

A transcript of the petitioner's guilty plea hearing was introduced into evidence. In that hearing, the following exchange occurred:

THE COURT: How old are you?

THE DEFENDANT: Fifty-five.

THE COURT: What education do you have?

THE DEFENDANT: I don't have much, sir. About third grade.

THE COURT: Did you learn to read and write?

THE DEFENDANT: No, sir.

THE COURT: Okay. [Defense Counsel]?

[Lead Defense Counsel]: Yes, your Honor.

THE COURT: Have you read this paper that the defendant has signed waiving his rights and pleading guilty to him verbatim?

[Lead Defense Counsel]: Yes, I have, your Honor.

THE COURT: And explained it?

[Lead Defense Counsel]: To the best of my ability, your Honor, yes, I have.

THE COURT: Well, the best of your ability is a pretty high standard. Mr. Mitchell, did you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Do you have any questions about it?

THE DEFENDANT: No, sir.

THE COURT: Anything about your health, physical, or mental condition that would cause you not to fully and completely understand these proceedings here today?

THE DEFENDANT: No, sir.

[Lead Defense Counsel]: Your Honor, for the record, Mr. Mitchell is taking some medications; but I've checked, and there's nothing about that medication that would impede his ability to proceed today that I know of; and in speaking with him this morning, he seems very, very clearheaded and ready.

THE COURT: Have you had any alcohol or drugs within the last 24 hours?

THE DEFENDANT: No, sir.

After the trial court read the charge from the indictment and explained the elements of the crime, the following exchange occurred:

THE COURT: Okay. Do you understand that -- You are charged with first degree murder, and, of course, the possible punishments for first degree murder, premeditated, are death by electrocution in Tennessee, life without parole, and life.
        Do you understand that?

THE DEFENDANT: Yes, sir.

[Lead Defense Counsel]: We understand that.

THE COURT: And do you understand that should you go to trial on a charge such as this, certainly the jury would be presented other offenses, lesser offenses, for which you could be convicted rather than this principal charge of first degree murder?

THE DEFENDANT: Yes, sir.

THE COURT: And it certainly is possible that you could be convicted of something less and receive a lesser sentence. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Also, understanding what your plea is today, it is possible that you could receive a greater sentence; do you understood [sic] that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Do you understand that -- Well, first, let me see -- Is this your -- Do you understand what these punishments mean? Of course, do you understand what it means to, for instance -- I'm sure you understand what it means to have a punishment of life, or death by electrocution. Do you understand what a sentence of life without parole means?

THE DEFENDANT: Yes, sir.

THE COURT: Can you explain that to me? Do you understand that means that you're going to spend the rest of you life in the penitentiary without any chance of parole?

THE DEFENDANT: Yes, sir.

. . . .

THE COURT: Are you pleading guilty because you are guilty?

THE DEFENDANT: Yes, sir.

THE COURT: Do you do so freely and voluntarily of your own free will?

THE DEFENDANT: Yes, sir.

THE COURT: Any force or threats of any kind used against you to cause you to plead guilty?

THE DEFENDANT: No, sir.

THE COURT: Any promises made to you except for your agreement with the State?

THE DEFENDANT: No.

. . . .

THE COURT: Are you satisfied with the representation of you by your lawyer, [lead defense counsel], and your lawyer, [co-counsel]?

THE DEFENDANT: Yes, sir.

THE COURT: Any complaint in any way about how they've represented you?

THE DEFENDANT: No, sir.

THE COURT: Anything that I've told you or asked you that you do not understand?

THE DEFENDANT: No, sir.

The trial court denied the post-conviction petition, finding that the petitioner knowingly, voluntarily, and intelligently entered his plea and that he did not receive the ineffective assistance of counsel. The trial court noted that in the guilty plea hearing, the petitioner seemed to understand fully and completely all of the questions, and the petitioner appropriately answered "yes" and "no." Furthermore, the trial court decided that the state made an offer not to seek the death penalty in return for the petitioner pleading guilty and being sentenced to life without the possibility of parole. The trial court found that defense counsel explained the offer in great detail to the petitioner and that the petitioner decided to accept the state's offer. While the trial court believed that Dr. Engum's report raised concern about the petitioner's diminished mental capacity, it decided that if the defendant had gone to trial, no better result would have been reached than a sentence of life without the possibility of parole.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must show the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). A trial court's findings of fact in a post-conviction hearing are conclusive on appeal unless the evidence in the record preponderates against those findings. See Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. Tenn. Code Ann. § 40-30-203.

## I. KNOWING AND INTELLIGENT GUILTY PLEA

The petitioner contends that he did not knowingly and voluntarily enter his guilty plea because his mental condition prevented him from understanding the proceedings and knowingly and intelligently waiving his constitutional rights. The state argues that the petitioner made his plea knowingly, intelligently, and voluntarily. We agree with the state.

Tennessee courts have determined what constitutes a knowing waiver in the context of other rights, such as the waiver of the right to trial and the waiver of the right against self-incrimination. See State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977); see also State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). A "knowing" waiver is one that is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Stephenson, 878 S.W.2d at 544-45 (citing Fare v. Michael C., 442 U.S. 707, 99 S. Ct. 2560 (1979); North Carolina v. Butler, 441 U.S. 369, 99 S. Ct. 1755 (1979)). Moreover, "relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception." Stephenson, 878 S.W.2d at 544. "[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i. e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" Mackey, 553 S.W.2d at 340.

When determining whether the petitioner entered a knowing and intelligent guilty plea, this court must consider the totality of the circumstances. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). Initially, we note that both Dr. Engum and Middle Tennessee Mental Health Institute evaluated the petitioner's mental condition and found him competent to stand trial. The petitioner does not contest those findings, and he did not present any proof at the post-conviction hearing regarding his competency. The guilty plea hearing transcript shows that the trial court questioned the petitioner extensively concerning whether or not the petitioner understood the charges against him, the sentence he was facing, and whether he was entering his plea knowingly, intelligently, and voluntarily. At no time did the petitioner indicate that he was confused or did not understand the proceedings. The petitioner said "yes" and "no" at the appropriate times, and despite his claims, there is nothing in the record to show that his attorneys whispered the answers to him. In fact, one of the petitioner's attorneys testified that answers were not whispered to the petitioner. Although the petitioner was on medication at the time he entered his guilty plea, there is no indication that the medication affected his ability to make a knowing, intelligent, and voluntary plea, and lead counsel remarked that the defendant seemed "very, very clearheaded and ready." Based on the totality of the circumstances, we believe that the trial court properly found that the petitioner entered his guilty plea knowingly, intelligently, and voluntarily.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, the petitioner argues that he received the ineffective assistance of counsel. The state contends that even if counsel's performance was deficient, the petitioner has not shown that he was prejudiced by the deficiency. We believe that the petitioner did not receive the ineffective assistance of counsel.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show that (1) counsel's performance was deficient, and (2) the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668,

687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). When a petitioner claims that ineffective assistance of counsel resulted in a guilty plea, the petitioner must prove that counsel performed deficiently and that but for counsel's errors, the petitioner would not have pled guilty and would have insisted upon going to trial. Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

As discussed above, in a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). We review the trial court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--under a purely de novo standard. Id. at 457.

A. Failure to File a Motion to Suppress

First, the petitioner contends that he received the ineffective assistance of counsel because his trial attorneys failed to file a motion to suppress the two statements he gave to the police soon after the killing. The petitioner argues that his mental condition may have prevented him from knowingly, voluntarily, and intelligently waiving his constitutional rights before he gave the statements.

This court has stated that if arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence. See Robert C. Bellafant v. State, No. 01C01-9705-CC-00183, Maury County, slip op. at 10 (Tenn. Crim. App. May 15, 1998). The petitioner's lead counsel and co-counsel acknowledged that they were concerned about the petitioner's mental state. We can see how a petitioner's mental state could provide grounds for a motion to suppress incriminating evidence. However, whether this petitioner's mental state provided such "arguable grounds" is not for the determination of this court. Furthermore, even if the petitioner's mental state provided arguable grounds for a motion to suppress, and his attorneys' failure to file the motion was deficient performance, the petitioner has

not demonstrated that he was prejudiced by the deficiency. In order to demonstrate prejudice, the petitioner would have to prove that his statements were inadmissible. The petitioner has offered no such proof, and we find nothing in the record to indicate that the petitioner's statements were inadmissible. Therefore, we will not grant relief on this issue.

### B. Failure to Explore Diminished Mental Capacity

Second, the petitioner contends that he received the ineffective assistance of counsel because his trial attorneys failed to explore the use of a diminished mental capacity defense. No mental health experts testified at the hearing. Although Dr. Engum's report indicates that the petitioner suffers from a diminished mental capacity, the petitioner has failed to provide any evidence as to how he was prejudiced by his attorneys' failure to explore this defense.

### C. Induced Plea

Next, the petitioner contends that he received the ineffective assistance of counsel because his trial attorneys induced him to plead guilty by falsely telling him that the state had filed a notice to seek the death penalty. Initially, we note that the evidence shows that the petitioner's attorneys merely told him that they were afraid that the state would file a notice to seek the death penalty. However, even taking the petitioner's allegations as true, the petitioner has failed to show how he was prejudiced by any false statement. At the post-conviction hearing, the petitioner did not testify that he would have gone to trial if he had he known that the state had not filed a notice to seek the death penalty, and he does not make that assertion in this appeal. We cannot grant relief on this issue.

### D. Failure to Request a Detailed Psychological Exam

Finally, the petitioner's brief states that despite Dr. Engum's recommendation that the petitioner receive a more detailed psychological examination, his attorneys failed to request such an examination. He contends that because his attorneys had a difficult time dealing with his ability to comprehend and understand his case, they should have recognized that a more detailed psychological exam was necessary. Thus, the petitioner is arguing that he received the ineffective assistance of counsel because his attorneys failed to request that he receive a more detailed psychological exam than that done by Dr. Engum. However, as with his earlier arguments, the petitioner has failed to demonstrate prejudice. He does not argue that a more detailed psychological exam would have revealed that he was incompetent to stand trial, and he did not offer proof at the post-conviction hearing of his mental condition. Therefore, the petitioner has failed to show that he received the ineffective assistance of counsel.

Based on the foregoing and the record as a whole we affirm the trial court's denial of the petitioner's post-conviction petition.

_____
JOSEPH M. TIPTON, JUDGE